UNITED STATES of America, Plaintiff-Appellee,

v.

Clarence Sheppard DAVIS, Joseph Leroy Armstrong and James O. Davis, Defendants-Appellants.

No. 81–5465.

United States Court of Appeals, Eleventh Circuit.

June 28, 1982.

Rehearings Denied and Rehearing En Banc Denied Aug. 27, 1982.

James P. Judkins, Davis & Judkins, Tallahassee, Fla., for Clarence S. Davis and Armstrong.

William B. Richbourg, Pensacola, Fla., for James O. Davis.

Thomas R. Santurri, Asst. U. S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, HILL and FAY, Circuit Judges.

GODBOLD, Chief Judge:

Appellants challenge their convictions for conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 846 and 841(a)(1). We affirm their convictions.

I.

In the spring of 1980, Sarah Smith began working in drug enforcement with the Escambia County Sheriff's Department in Pensacola, Florida and the Federal Drug Enforcement Agency ("DEA"). Two DEA agents, Warner and Schmidt, posed as Texans looking for a large, continuous supply of cocaine.

In June 1980 Smith approached James Cohron to act as a middleman for her Texan buyers and appellant James Davis. She explained to Cohron that Davis did not

want to do business with her directly. Cohron did not make any arrangements with Davis to supply the agents until August; however, he agreed to market some cocaine for Davis in June without Smith's knowledge.

Meanwhile Davis and the agents unsuccessfully negotiated concerning several cocaine transactions. Davis spoke with both DEA agents by telephone in July proposing that they give Smith the money for a kilogram (2.2 lbs.) of cocaine at $2,100 an ounce.[1] Smith would then follow Davis by car to the sellers somewhere in Florida where the exchange would take place. The sellers were located in the eastern standard time zone, and the round trip would take up to 12 hours. The agents did not agree to this plan, claiming they wanted to test the cocaine themselves before they parted with the money.

On August 13 Davis discussed with agents by phone a plan whereby one of the agents would travel with Smith and with someone acting on behalf of Davis to the sellers who lived five hours driving time from Pensacola and 100 miles from Tallahassee. The agent could then test the cocaine before buying it. The agents again expressed reservations about the plan because of the drive. Davis assured agent Warner that "his man" could be trusted because Davis had known him since the day he was born.

Shortly after this conversation Davis changed the plans by arranging for delivery to the agents in Pensacola, and Cohron began to participate as the middleman. Several days before the proposed delivery date of August 22 Davis drove to Cohron's house and gave Cohron a purported sample of the cocaine the agents would be buying. Cohron reported to the agents that the cocaine was of good quality.[2]

On August 22 Cohron met with Smith and several agents at a restaurant. The agents showed Cohron a suitcase containing $56,000. Cohron and the agents agreed that he would deliver the cocaine to their motel room that evening.

Late that evening there were a series of phone calls between Cohron and Davis, and Cohron and the agents, because Davis was running behind schedule. Davis told Cohron to stall the buyers; the agents kept pressuring Cohron to deliver. Around midnight appellants Joseph Armstrong and Clarence Davis ("Clarence"), Davis' nephew, arrived at Davis' house in an Oldsmobile that belonged to a woman in Cross City, where Clarence lived. They stayed at the house about 10 minutes and left with Davis in the Oldsmobile. They drove to Cohron's house. Cohron met them at the door, and one of the three gave him the cocaine in a plastic bag inside a brown paper bag. Davis introduced Clarence and Armstrong to Cohron, who had never met the two. All four went into Cohron's bedroom. Davis and Cohron stood by the dresser while Cohron took the cocaine out of the bag and weighed it. Clarence and Armstrong stood by the door about six feet away watching. Cohron discussed with Davis the delivery and Cohron's fee. Davis permitted Cohron to take out one-half ounce as part payment for his participation.

Cohron expressed fear that he might be robbed by the buyers. Davis indicated that he would be nearby in case anything happened. Armstrong told Cohron that he did not want to be involved in the delivery and asked permission to wait at Cohron's house. Cohron refused but suggested that Armstrong wait at a restaurant.

Cohron then headed for the motel driving his own car. Appellants followed in the Oldsmobile driven by Clarence. While Cohron went to the agents' room, appellants parked their car in a gas station across the street from the motel to watch. Cohron was promptly arrested inside the room. As sheriff deputies drove to the gas station to arrest appellants, Armstrong exited from

---

1. Davis would charge $100 per ounce for his procuring services.

2. Davis had represented to the agents that the cocaine would be at least 80% pure. The analysis of the cocaine seized from Cohron at his arrest showed it was only 43% pure.

the back seat of the car and began walking away. One of the deputies ordered him to stop. Clarence started the car, and Davis got out. The deputy and Davis struggled over a gun Davis carried in a holster. After Davis was subdued the deputy ordered Armstrong to walk back to the car. The deputy then saw Armstrong drop a film canister later found to contain a small amount of cocaine and attempt to kick it away. Armstrong was also carrying another small container that held baking soda. A loaded pistol resting in its case was found on the back seat of the Oldsmobile.

## II.

Appellant James Davis asserts failure to comply with the Speedy Trial Act. All appellants challenge the indictment, the sufficiency of evidence and a prosecutorial remark.

### (A) *Speedy Trial Act*

The Speedy Trial Act, 18 U.S.C. § 3161(c)(1), requires a defendant to be brought to trial within 70 days of his indictment. Appellants were indicted September 10, 1980. Trial was originally scheduled for November 12, 1980. On the day of trial counsel for appellants[3] and the prosecuting attorney informed the court that a plea had been negotiated, and the court scheduled for November 13, 1980 a hearing to accept the pleas. On the day of the hearing Clarence and Armstrong changed their minds and decided to go to trial with different counsel. Although Davis was still willing to plead guilty the government insisted that the plea bargain had been conditioned upon all appellants pleading guilty to spare the expense of trial and withdrew its plea offer to Davis.

The court rescheduled the trial for all defendants for January 14, 1981, finding the time between November 13 and January 14 excludable for purposes of calculating the Speedy Trial Act deadline. The

court stated that court space and personnel were unavailable to accommodate the sudden change in pleas until January and that the ends of justice served by granting a continuance outweighed the interest of the public and of the appellants in a speedy trial.

Davis contends that the delay caused by the plea changes cannot be attributed to him because he remained willing to perform the plea agreement. Because he was not brought to trial by November 20, 1980—70 days from indictment—Davis argues that § 3162(a)(2) mandates the dismissal of the indictment against him.

The Act lists several conditions under which time may be excluded from the 70-day computation. Section 3161(h)(7) excludes a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." We find no violation of the Act. The time had not run for Davis' codefendants, and the two-month delay for Davis was reasonable.

First, we consider the requirement of § 3161(h)(7) that the time had not run for the codefendants. Although general congestion of the court's calendar is an insufficient excuse for delay under the Act, § 3161(h)(8)(C), the circumstances surrounding the change in trial dates justify our attributing the delay to Clarence and Armstrong. The court cancelled the original trial date after all appellants represented that they had agreed to plead guilty. When Clarence and Armstrong refused to plead, the trial could not be worked back into the court's calendar until January 14, 1981. In addition, Clarence and Armstrong needed time to secure new counsel.[4]

The decision by Clarence and Armstrong not to plead guilty is analogous to a defendant's withdrawing a guilty plea. Section 3161(i) provides that when a defendant's

---

**3.** During pretrial appellants were all represented by the same counsel.

**4.** Although the district court did not cite the necessity for Clarence and Armstrong to obtain

new counsel as a reason for granting the continuance, we note that a substitution of counsel was not filed until December 18, 1980.

time for trial has elapsed because he pleaded guilty and then subsequently withdrew the plea, the 70-day time period runs anew from the date of the court order permitting the plea withdrawal. Had the district court taken the pleas of Clarence and Armstrong on the day counsel informed the court of the pleas, and permitted them to withdraw their pleas the next day, the time for a speedy trial would have been extended to January 22, 1981, 70 days from November 13, 1980. Instead the court allowed Clarence and Armstrong an additional day, perhaps to work out some remaining details of the plea agreement or to insure that they had enough time to be certain. It would be incongruous for the Act to extend a defendant's time for trial 70 days when the defendant formally withdraws the plea but to require dismissal of the indictment when a defendant withdraws a tentative plea.

If we did not exclude from the 70-day computation the delay caused by Clarence's and Armstrong's change of mind, defendants seeking plea bargains would suffer. Courts would impose a strict deadline on accepting guilty pleas,[5] and defendants would have less time in which to make a decision.

We need comment only briefly on the second requirement of § 3161(h)(7)—that the period of delay is reasonable. The two-month period necessary for the court to conduct previously scheduled trials and for Clarence and Armstrong to obtain new counsel was reasonable. Davis' ability to defend himself was not prejudiced by this delay.

■ The cases cited by Davis for the proposition that the government negotiates pleas at its own risk of violating the Act are inapposite. In *U. S. v. Carini*, 562 F.2d 144 (2d Cir. 1977) and *U. S. v. Roberts*, 515 F.2d 642 (2d Cir. 1975), the government required the defendant to withhold his plea until he performed his part of the bargain, such as maintaining good behavior for an extended time period, *Carini* or testifying at his co-conspirator's trial, *Roberts.* In both cases the bargain fell through more than a year after the defendant's time for trial had passed, and the defendant did not cause the bargain to fail. The courts held that when the government deliberately prolongs a defendant's case for its own benefit, it does so at its own risk. The rationale of these cases does not extend to the facts of this case, where the government withdrew from the plea agreement only because Davis' co-defendants withdrew first. The government did not delay the time for Davis to plead guilty pending fulfillment of a condition from which the government benefited. In addition, trial commenced only 25 days after the time had run.

### (B) *Indictment, amendment or variance*

The indictment charged appellants and three others—Cohron, Gerry Hencye and William Norrie—with conspiracy to distribute cocaine from February 1980 until August 23, 1980 in the northern district of Florida and other places. The government further alleged, in answer to a bill of particulars, that the conspiracy was conducted in Texas, Alabama and Florida.

On November 7, 1980 the district court conducted a *James*[6] hearing to determine if there was sufficient independent evidence that the alleged conspiracy existed prior to the court's permitting the introduction at trial of co-conspirators' statements. Smith testified that she traveled with Hencye and Norrie to Texas in April 1980 to sell cocaine. During that trip Hencye told her that he received the cocaine from Davis. Smith further stated that in May she asked Davis if he would sell her cocaine without Hencye, and Davis told her that Hencye owed him a lot of money from the previous cocaine transaction. According to Smith, Hencye and Norrie did not participate in the transaction for which appellants were

---

5. The district court's pretrial order in this case required guilty pleas to be entered by November 4, 1980, although the court did not enforce this provision.

6. *U. S. v. James*, 590 F.2d 575 (5th Cir.) *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

arrested and the two did not know Clarence and Armstrong. Smith had never met Clarence or Armstrong, either.

Cohron testified that he cut cocaine for Hencye until January of 1980.[7] Norrie would sometimes deliver cocaine from Hencye to Cohron. Davis had told Cohron that he [Davis] would no longer do business with Hencye, who still owed him money from the last transaction. Cohron believed that Hencye and Norrie played no part in the August 22 transaction and that they did not know Clarence and Armstrong.

The district court tentatively held that the government had shown the existence of two separate conspiracies, one between Hencye, Norrie and Cohron and one between Cohron, Davis, Clarence and Armstrong. He further held that no co-conspirators' statements would be admissible and suggested that the government dismiss the indictment as drawn.

Some time during the delay between the hearing and the trial, the court dismissed Hencye and Norrie from the case at the government's request. Appellants were tried on the original indictment, which still included Hencye and Norrie as co-conspirators. During the trial the court held another *James* hearing outside the presence of the jury. This time the government confined the testimony to the events leading up to the August 23 arrests, and the court found that there was substantial and independent evidence that the conspiracy existed.

■ Appellants assert that the government constructively amended the indictment by dropping Hencye and Norrie. In the alternative they contend that the proof adduced at trial fatally varied from the indictment because the conspiracy alleged was not the conspiracy proved. We conclude that the proof at trial varied from the conspiracy alleged but that appellants were not prejudiced by the variance.

■ A constructive amendment occurs when the evidence presented at trial and the jury instructions "so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *U. S. v. Ylda*, 653 F.2d 912, 914 (5th Cir. 1981).[8] An amendment violates an accused's right to be tried solely on allegations returned by the grand jury and requires reversal. *Stirone v. U. S.*, 361 U.S. 212, 215–218, 80 S.Ct. 270, 272–273, 4 L.Ed.2d 252 (1960).

■ A variance results when the terms of the indictment are unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment. *U. S. v. Salinas*, 654 F.2d 319, 324 (5th Cir. 1981). A variance mandates reversal only when it substantially prejudiced a defendant's rights. *Berger v. U. S.*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

■ The government did not constructively amend the indictment by moving to dismiss Hencye and Norrie from the case. Appellants were charged and convicted of conspiracy to sell cocaine and possession to distribute cocaine. The evidence showed a conspiracy with fewer people, of shorter duration, and in a smaller area, but none of the essential elements was altered. The existence of the conspiracy agreement rather than the identity of those who agree is the essential element to prove conspiracy. *U. S. v. De Cavalcante*, 440 F.2d 1264, 1272

---

7. Smith testified that Cohron did not stop working for Hencye until April 1980.

8. *See Stirone v. U. S.*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (indictment charged obstruction of interstate commerce in concrete; court charged jury on obstruction of commerce in cement and steel); *U. S. v. Figueroa*, 666 F.2d 1375 (11th Cir. 1982) (indictment charged attempted hijacking by force or violence; evidence showed only use of threats and intimida-

tion); *U. S. v. Bizzard*, 615 F.2d 1080 (5th Cir. 1980) (indictment charged defendant had placed lives in jeopardy while robbing bank; evidence showed only assault); *U. S. v. Salinas*, 601 F.2d 1279 (5th Cir. 1979) (indictment charged defendants with misapplication of bank funds while acting as bank director and president; jury instructed that defendants could be found guilty if acting as officers, directors, agents or employees).

(D.C.Cir.1971).[9] Neither is time an essential element so long as the time frame proved was within the period alleged in the indictment. *Russell v. U. S.,* 429 F.2d 237, 238 (5th Cir. 1970). The geographic location of the conspiracy proved at trial was also within the boundaries set by the indictment.

▮ Although the government did not alter the basic conspiratorial agreement for which appellants were indicted to the extent of a constructive amendment, the proof at trial varied from the indictment. The requirement that proof correspond to the indictment insures that (1) the defendant will be adequately informed of the charges to prepare his defense without surprise at trial; and (2) the defendant will not be subject to another prosecution for the same offense. *Berger v. U. S.,* 295 U.S. at 82, 55 S.Ct. at 630. We focus on whether appellants' substantial rights were affected by the variance, and we find no prejudice.

Although the indictment was over-inclusive, it gave sufficient notice to appellants of the charges against them. The cocaine transaction for which they were tried was included within the geographic boundaries, timeframe and group of conspirators alleged. No additional evidence was introduced at trial. In addition, the court held a *James* hearing two months before trial at which the government put on its primary witnesses.

There is also no danger of further prosecution for the same offense because the grand jury reindicted Hencye and Norrie without naming appellants as co-conspirators. *See U. S. v. Hencye,* 505 F.Supp. 968 (N.D.Fla.1981).

When the government restricted its evidence to the smaller conspiracy it eliminated the risk that the jury might have transferred guilt from Hencye and Norrie to appellants across the line separating the two conspiracies.[10] *See Kotteakos v. U. S.,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Appellants' contention that they suffered prejudice because they were prepared to defend against the larger conspiracy but not the smaller one is nothing more than an argument that they had less of a defense against the smaller conspiracy since the larger one may not have existed. Appellants cannot say that the evidence presented against them came as a surprise.

(C) *Sufficiency of evidence*

▮ When determining the sufficiency of evidence we must review the evidence in the light most favorable to the government, accepting all reasonable inferences gathered from direct and circumstantial evidence. *U. S. v. Doe,* 664 F.2d 546, 548 (5th Cir. 1981). We will sustain a conviction if "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *U. S. v. Bell,* 678 F.2d 547 (5th Cir. 1982) (en banc).

Davis challenges his conviction for possession of cocaine with intent to distribute. He argues that because he was acting as a middleman receiving $100 per ounce, the seller maintained control over the cocaine until Cohron delivered it. Davis also points out that Cohron could not remember which of the three men—Davis, Clarence or Armstrong—handed him the cocaine when he met them at the door.

▮ Even if Davis never actually handled the cocaine,[11] the jury could find that he had constructive possession. Constructive possession may be established by evidence showing ownership, dominion or

---

**9.** In *De Cavalcante,* the indictment included as co-conspirators "persons whose names are to the Grand Jury unknown." Five months before trial, the government listed two other persons as co-conspirators although evidence about those people had been presented to the grand jury.

**10.** The only evidence of the Hencye-Norrie-Cohron conspiracy was introduced during

cross-examination of Smith and Cohron by defense counsel.

**11.** Cohron first testified that Davis handed him the cocaine when Cohron met the three at the door. He later equivocated, stating that he could not swear that Davis gave him the cocaine. He assumed that it was Davis because he did not know the other two men.

control over the contraband itself or the premises or vehicle in which the contraband was concealed. *U. S. v. Ferg*, 504 F.2d 914, 916 (5th Cir. 1974). Possession may be shared among several conspirators, each of whom performs a distinct role in the transaction. *U. S. v. Ramos*, 666 F.2d 469, 476 (11th Cir. 1982).

The telephone conversations between Davis and the DEA agents, and Cohron's testimony, indicate that Davis was responsible for bringing the cocaine to Cohron and collecting the money from Cohron after delivery. Davis and Cohron stood together by the bedroom dresser while Cohron examined and weighed the cocaine. Cohron discussed with Davis the details of delivery and Cohron's fee. Cohron sought permission from Davis to take one-half ounce from the pound of cocaine as partial payment. Davis assured Cohron that he would be around for protection. The jury could also infer from Davis' recorded conversations that Davis followed Cohron to insure safe delivery of the cocaine. We find ample evidence to support Davis' conviction for possession of cocaine with intent to distribute.

Clarence Davis attacks his conviction for conspiracy and possession with intent to distribute. The evidence was sufficient to prove beyond a reasonable doubt that Clarence had "the deliberate, knowing, specific intent to join the conspiracy." *U. S. v. Morado*, 454 F.2d 167, 175 (5th Cir.) *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). Clarence drove Davis to Cohron's house late at night. He was present in the bedroom when Cohron unpackaged the cocaine and weighed it. Although Cohron testified that he spoke with Davis in a low voice [12] the jury could conclude that Clarence heard the conversation, especially when Armstrong who was standing next to Clarence, remarked that he did not want to be involved in the delivery.

Clarence drove the car following Cohron to the motel and watched from across the street. When the deputies approached the car with their badges visible Clarence started the car. Finally, when Davis told Warner that he had known "his man" [who would accompany Smith to pick up the cocaine in one of the earlier proposed transactions] since the day he was born, the jury could reasonably infer from this remark that Davis was speaking about his nephew. From these facts the jury could find that Clarence knew Davis sold cocaine and that Clarence voluntarily participated by providing transportation and protection. [13]

We also find sufficient evidence to sustain Clarence's conviction for possession of cocaine with intent to distribute. Constructive possession may be proved by establishing that Clarence delivered the cocaine to Davis from another part of Florida from the following facts. Davis told Agent Warner during one of the phone conversations that good quality cocaine was almost impossible to buy in Pensacola because it changed hands too many times from its point of entry into the United States. This problem, Davis explained, made it necessary to travel a great distance in Florida to get the cocaine. Davis mentioned calling his source, who lived in the eastern standard time zone. One of his proposals required the agents to drive five hours from Pensacola or 100 miles from Tallahassee to the supplier. Clarence lived in Cross City, which is in the eastern time zone and is about 100 miles from Tallahassee. Toll records covering several months showed an increased number of calls from Clarence's residence to Davis' home in August.

Davis was delayed several hours in delivering the cocaine to Cohron. Despite the agents' impatience, which Cohron relayed to him, Davis had Cohron stall the buyers, suggesting Cohron tell them "we had a flat in Marianna," a city between Tallahassee and Pensacola. This delay suggests that

---

12. Cohron explained that he did not want his family who were in the next room to hear; he added that he was "not too crazy" about Clarence and Armstrong hearing since he did not know them.

13. The jury could also have found that Clarence actually supplied or picked up the cocaine from Davis' source in the eastern part of Florida. See discussion *infra*.

Davis did not have the cocaine to deliver yet and that it was coming from the eastern part of Florida. Only after Clarence arrived at his house just past midnight did Davis almost immediately head for Cohron's house with the cocaine. One of the deputies observed that the car's windshield was covered with bugs, indicating recent high-speed driving.[14]

Although the evidence does not confirm that Clarence was the large-scale supplier of cocaine to whom Davis referred, it does establish beyond a reasonable doubt that Clarence procured the cocaine for Davis somewhere east of the Florida panhandle [15] and brought it to Davis on the night of August 22.

■ Armstrong attacks his convictions for conspiracy and possession with intent to distribute.[16] We uphold Armstrong's convictions because there was sufficient evidence to establish that he knowingly participated in the conspiracy and exercised constructive possession over the cocaine.

Armstrong accompanied Clarence to Davis' house and then to Cohron's house. Although mere presence at the scene of the crime is not sufficient to establish knowing participation,[17] the jury could find that Armstrong voluntarily agreed to participate in the drug conspiracy beyond a reasonable doubt from additional evidence. He followed Davis and Clarence to Cohron's bedroom where Cohron weighed the cocaine and discussed details of the sale with Davis. Armstrong wanted to wait at Cohron's house during the delivery. The remark demonstrates that Armstrong knew a drug transaction was planned. The jury could reasonably interpret Armstrong's preference to mean that having completed the job of delivering the cocaine from the supplier to Davis, Armstrong did not want to incur further risk by being near the scene of delivery. Armstrong travelled with Clarence and Davis when they followed Cohron to the motel and when they watched the motel from the gas station across the street. Armstrong exited from the back seat when a plain-clothed deputy who was wearing a badge approached the car.[18] The jury could reasonably infer that Armstrong was avoiding arrest. A loaded gun resting in an open case was found in the back seat, indicating that Armstrong knew he was involved in an illegal transaction and was protecting his interest in the conspiracy. *See U. S. v. Lippner*, 676 F.2d 456, 463 (11th Cir. 1982). Armstrong tried to conceal a canister containing a substance later identified as cocaine.

The same evidence supports Armstrong's conviction for possession of cocaine with intent to distribute. The jury could find beyond a reasonable doubt that Armstrong shared constructive possession of the cocaine with Clarence and Davis, *U. S. v. Ramos, supra*. Armstrong helped transport the cocaine. He was present when Cohron weighed the cocaine. He accompanied Clarence and Davis when they followed Cohron to the motel to insure safe delivery to the buyers. Finally, the jury could infer from the loaded gun that Armstrong was protecting his interest in the cocaine.

(D) *Prosecutorial remark*

During trial the court held a *James* hearing outside the presence of the jury and

---

14. Defense counsel argued to the jury that Clarence was probably visiting his parents who lived in Pensacola and merely offered to drive his uncle on an errand without knowing the nature of the trip.

15. The panhandle is a narrow strip of land extending for 200 miles underneath Georgia and Alabama from Tallahassee to Pensacola which forms the northwestern portion of Florida.

16. He does not challenge his conviction for simple possession in violation of 21 U.S.C. § 844(a) for the small amount of cocaine found in the film canister.

17. *U. S. v. Davis*, 666 F.2d 195 (5th Cir. 1982).

18. Deputy Mooneyham testified that he was the first officer to pull into the gas station in an unmarked car. He remained in the car waiting for a signal from Deputy Cardwell to start the arrest. He observed Cardwell get out of the car and saw Armstrong leave the Oldsmobile "at the same time." Although Cardwell stated on cross-examination that Armstrong left the car before Cardwell pulled into the gas station, the jury could resolve the conflict in testimony in favor of Mooneyham.

found that there was substantial and independent evidence that the conspiracy alleged in the indictment existed. Consequently the court ruled that co-conspirators' statements would be admissible.

During the government's direct examination of Smith, defense counsel objected, on grounds of hearsay, to Smith's repeating a statement made by Cohron. The assistant U. S. Attorney responded:

James Cohron was a co-conspirator, Your Honor. I believe you made a finding in the record with respect to that.

Defense counsel unsuccessfully moved for a mistrial because the prosecuting attorney had inadvertently informed the jury that the court had already found the existence of a conspiracy.

 Even if the jury grasped the significance of the remark, the court cured any possible error by instructing the jury that it was the sole factfinder as to the existence of the conspiracy and that statements made by counsel were not evidence.

### III.

The convictions of James Davis, Clarence Davis and Joseph Armstrong are AFFIRMED.