**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Eugene BOWERS, Oacus Donald
Oakes, Defendants-Appellants.**

Nos. 83–5293, 83–5425.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 23, 1984.

Decided April 20, 1984.

Certiorari Denied Oct. 1, 1984.
See 105 S.Ct. 195.

John M. Berry, argued, Louisville, Ky., for Bowers.

David Murrell, argued, Louisville, Ky., for Oakes.

Ronald E. Meredith, U.S. Atty., Richard Dennis, Asst. U.S. Atty., argued, Louisville, Ky., for the U.S.

Before EDWARDS and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

PER CURIAM.

Defendants appeal their convictions stemming from an alleged scheme to run "ringer" horses at thoroughbred race tracks. The judgments are affirmed.

## I.

Donald Bowers and Oacus Donald Oakes, appellants here, were charged along with Glendo Sullivan, Omar Fannin, Richard Ahrens, William Martin and Jack Cobb in a three-count indictment stemming from an alleged scheme to run ringer horses at thoroughbred race tracks in Kentucky, Louisiana, Ohio, and Illinois. In most states, a thoroughbred horse cannot be

raced unless its certificate of foal registration is on file. That certificate, among other things, establishes the previous track record of the horse to ensure that horses of high caliber are not entered in events designated for horses that have not previously performed well. The certificate also bears a registration number; that number relates to a number tattooed on a horse to ensure that the certificate presented with that horse indeed represents the record of that horse rather than some other horse. The scheme charged by the government involved procuring the certificates of horses with bad records, procuring good horses that had not previously been tattooed, and inscribing tattoos on those horses to match the procured registration forms, and racing a horse under a false or forged certificate.

All the defendants were named in the first count of the indictment, which charged a conspiracy to violate 18 U.S.C. § 1952 (proscribing interstate travel to promote unlawful, gambling-related activities) and 18 U.S.C. § 2314 (proscribing the transportation in interstate commerce of a falsely made, forged, altered, or counterfeited security). In counts 2 and 3, which charge the substantive violation of §§ 1952 and 2314, only Fannin was named. Prior to trial, all defendants but Bowers, Oakes, and Fannin pleaded guilty. The remaining defendants stood trial before Judge Johnstone. Defendants Bowers and Oakes were convicted as charged in count 1, but Fannin was acquitted on all counts.

## II.

Both Oakes and Bowers challenge the sufficiency of the evidence to sustain their convictions. Bowers argues that the lack of evidence of his interstate activity in furtherance of the conspiracy requires reversal of his conviction for conspiracy to violate the Travel Act, 18 U.S.C. § 1952. Both Oakes and Bowers question whether the activities charged in Louisiana trigger sufficient state penalties to support conviction under the Travel Act.

The Travel Act defines as criminal the travel in interstate commerce with the intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3); *see id.* § 1952(a). "Unlawful activity" embraces "any business enterprise involving gambling ... in violation of the laws of the state in which ... committed." *Id.* § 1952(b). To prove its case here, therefore, the government must show both the occurrence of interstate travel and the illegality of the promoted gambling activity in the state in which it occurred.

Bowers argues that the government did not show that he travelled in interstate commerce in promotion of the charged scheme. In so doing, Bowers overlooks the settled rule that a conspirator is liable for acts undertaken by a co-conspirator in furtherance of their conspiracy. *See United States v. Chambers*, 382 F.2d 910, 913–14 (6th Cir.1967); *see also, e.g., United States v. Craig*, 573 F.2d 455 (7th Cir.1977). Even if we were to assume that Bowers himself was not shown to have travelled interstate in furtherance of the conspiracy, ample evidence demonstrates interstate travel in furtherance of the conspiracy by other conspirators; because Bowers was shown to have joined the conspiracy, their interstate activities are attributable to Bowers, and his argument in that respect must fail.

Both Bowers and Oakes argue further that, because their activities in Louisiana would merely give rise to administrative sanctions under Louisiana law rather than criminal penalties, those activities do not constitute "unlawful activity" within the meaning of the Travel Act. This contention need not be addressed, however, since other aspects of the conspiracy violated state penal laws and therefore indisputably constitute "unlawful activities." The conspiracy proved at trial involved the running of ringers not only in Louisiana, but also in Kentucky. Kentucky law imposes criminal penalties for running ringers. *See* Ky.Rev.Stat. § 230.990(1) (authorizing fines and imprisonment for running ringers in violation of *id.* .070, .080(3)). Given the liability of a conspirator for a co-conspira-

tor's act, *see supra* p. ——, any error in relying on the Louisiana activities as a predicate for Travel Act liability was harmless, particularly in view of the guilty pleas of other co-conspirators involving activities beyond Louisiana.

### III.

In addition to the arguments raised in concert with his co-defendant, defendant Oakes raises two other issues. First, he argues that the proof at trial impermissibly varied from the conspiracy charged at trial. Second, he claims that the government failed to furnish him exculpatory information as required.

### A.

The indictment charged a sweeping conspiracy involving seven defendants. Immediately preceding trial, four of the defendants pleaded guilty, leaving three defendants to go to trial. Rather than proving the originally charged conspiracy, the government offered proof as to a lesser conspiracy sufficient to cover the remaining defendants but omitting some evidence that would have been required to implicate some of the defendants who pleaded guilty. The government admits that the "evidence introduced at trial by the United States showed a conspiracy with fewer people, of shorter duration and in a smaller area" than charged and that "the indictment was overinclusive." Government's Brief at 35. Oakes claims that this variance requires reversal.[1]

■■■ Variance between the indictment and the proof at trial requires reversal only when prejudice to the defendant results.[2] *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935). *See generally,* C. Wright, *Federal Practice and Procedure* § 516 (2d ed. 1982). In

*United States v. Davis,* 679 F.2d 845 (11th Cir.1982), the Eleventh Circuit confronted a case in which the government, as here, proved only a part of the conspiracy charged in the indictment, but did not adduce proof beyond the scope of the charge in the indictment. The court there found that no prejudice resulted to a defendant by that practice. Because the bounds of the indictment were not crossed, evidence at trial could impermissibly surprise a defendant. *Id.* at 852. The court rejected the argument that defendants were prejudiced by the variance because "they had less of a defense against the smaller conspiracy since the larger one may not have existed." *Id.* Nor does the course followed at trial prejudice the defendant by depriving him of the double-jeopardy protections afforded by an indictment. *See id.* (citing *Berger, supra*). If anything, the indictment here, by covering all of the evidence adduced at trial and some that was not, protects the defendant from future prosecution. The trial judge was careful to instruct the jury that it could convict based only on the conspiracy charged in the indictment, not on some other, or lesser, illegal combination. We find no merit in the variance contention.

### B.

Witness Wendell Turner identified defendant Oakes as an individual who had visited Turner several times in California seeking to purchase unmarked horses. Turner identified Oakes at trial and stated that Oakes previously identified himself as Glendo Sullivan, named as a defendant in the indictment, when visiting Turner in California. But defendant points to some discrepancy in Turner's stories. In a statement given to the FBI, Turner described the individual identified to him as Sullivan

---

1. Oakes also claims that the testimony at trial revealed small, independent conspiracies rather than a single conspiracy. Sufficient evidence supports the jury's conclusion that only a single conspiracy was proved at trial. *See, e.g.,* Transcript at 229 (Oakes helped transport horse from Louisiana to Indiana).

2. The government maintains that only the truncated conspiracy was proved because the district court ordered the government to exclude some proof. This argument, made for the first time at oral argument and without citation to the transcript, may not be entirely supported by the record.

as standing 5'5", being chunky, and having dark hair. Defendant Oakes, on the other hand, is about 6' tall and weighs 220 pounds. Oakes argues that the government's failure to supply the FBI statement to him prior to trial constituted reversible error under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), since it tended to show that Oakes had never met Turner in California and inquired about purchasing unmarked horses.

■ That argument must be rejected. *Brady* involved a situation in which exculpatory evidence possessed by the prosecution was not discovered by the defense until after a trail was completed. In this case, on the other hand, the FBI statement was admittedly given to defendant prior to Turner's testimony as part of the Jencks Act material. If this were considered exculpatory evidence no prejudice resulted in this case since defendant had full opportunity to cross-examine and bring out any discrepancy. In fact, the FBI statement was read into the evidence in its entirety. *See* Transcript at 1101.

## IV.

Defendant Bowers raises three arguments not addressed by his co-defendant on appeal. First, he maintains that admission of certain "prior acts" testimony required a mistrial to be declared. Second, he questions the admissibility of statements he made to a private security officer. Third, he argues that 18 U.S.C. § 2314 was not intended to proscribe transportation of documents such as the certificate of foal registration involved here.

### A.

Witness Wendell Turner was permitted to testify, over Bowers' objection, concerning an incident that allegedly occurred in June, 1980. Turner told the jury that he overheard Bowers claim to have run a ringer at Jefferson Downs. Turner stated that he had overheard Bowers claim to have won $17,000 by betting on the horse. Although the court initially admitted the evidence, it subsequently struck the evidence

from the record pursuant to Fed.R.Evid. 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge identity, or absence of mistake or accident.

After determining to strike the evidence, the district court admonished the jury as follows:

> There was a statement admitted into evidence made by Wendell Turner relevant to a ringer that was run at Jefferson Downs and something about $17,000.00. It appears that that incident was separate and distinct from this incident. It is difficult for you to do, but you must disregard that statement in its entirety because it was not part of this case. It was a statement made by Mr. Wendell Turner. Do not consider it in any manner in your consideration of this case. That is the admonition.

Transcript at 1103. The court also gave the following general admonition to the jury:

> Testimony that has been excluded, stricken or that you have been instructed to disregard is not evidence and must be disregarded.

*Id.* at 1248–49. The government argues that the cautionary instructions were sufficient to prevent defendant from being prejudiced by the challenged evidence. Defendant, however, argues that the instruction could not be deemed sufficient to negate the error because (1) the government injected the testimony into the trial intentionally and (2) the other evidence tying defendant to the crime was sufficiently tenuous that the error could not be considered harmless.

Despite defendant's contentions, *United States v. Ailstock*, 546 F.2d 1285 (6th Cir. 1976), and *United States v. Wiley*, 534 F.2d 659 (6th Cir.1976), do not control here. No

cautionary instruction was requested or given in *Ailstock, see id.* at 1291, unlike the situation here. Although an instruction was given in *Wiley,* that instruction itself was flawed; indeed, the court believed that the purportedly curative instruction actually compounded the error made in admitting testimony regarding prior acts. *See* 534 F.2d at 663. Likewise, defendant's reliance on *United States v. Blanton,* 520 F.2d 907 (6th Cir.1975), and *United States v. Perry,* 512 F.2d 805 (6th Cir.1975) (per curiam), for the proposition that intentional injection of prejudicial evidence by the prosecution should result in reversal, is misplaced. There was no mention in *Blanton* whether the district court had admonished the jury to disregard the impermissibly admitted testimony. *See* 520 F.2d at 909–10. And in *Perry,* the court explicitly noted that it might not have reversed the conviction solely on the basis of an incident of improperly admitted prior act testimony if it were not for other errors that also infected the trial. *See* 512 F.2d at 806.

 Reversal is not indicated on this ground in this case. While the district court determined that the testimony in question ought to be excluded, the government's argument that the testimony should be admitted under Fed.R.Evid. 404(b) may be well founded. The prior episode was similar to the conduct charged in the indictment and it may well have pertained to Bowers' intent, knowledge or plan in respect to arranging for a ringer to race under his purported ownership. Unlike *Blanton,* this case does not involve circumstances that create an inference that the government has acted in bad faith in injecting tainted evidence at trial. The curative instructions here, unlike the instructions in *Wiley,* were clear and forceful. Moreover, the challenged evidence here constitutes but a small portion of the total testimony presented at trial. While the other testimony linking Bowers to the conspiracy largely came from an alleged accomplice, that evi-

dence is an important consideration in evaluating the prejudice to a defendant in admission of "prior acts" testimony. In *Ailstock* itself, the court did not rely solely on the source of testimony implicating a defendant. It also noted that an eyewitness to the alleged crime had been unable to identify the defendant, *see* 546 F.2d at 1290–91, and the "prior acts" testimony there involved the defendant's prior imprisonment, *see id.* at 1289, testimony likely to arouse a high degree of prejudice in a jury, and unrelated to the specific criminal offense charged.

### B.

During the investigation of the scheme charged in the indictment, defendant Bowers was called to the office of agent James Layman of the Thoroughbred Racing Detective Bureau, a private agency, at Calder Race Track in Florida to be questioned concerning suspicions regarding "Mama's Clue," one of the horses that defendants ran as a ringer.[3] Defendant was given no *Miranda* warnings. He testified that he believed failure to respond to questions propounded by Layman would result in disciplinary action. Defendant made statements to Layman that were subsequently introduced at trial and tended to show defendant's inability to settle on a single story concerning his connection with or ignorance of the scheme to run ringers. Defendant contends that the statements made to agent Layman should be suppressed because of the agent's failure to give *Miranda* warnings to defendant. Under another line of authority, defendant argues that the statements would have been inadmissible in the criminal trial even if *Miranda* warnings had been given.

 *Miranda* warnings are required when police question a suspect in a *custodial* situation. That is not the case here. Bowers admits that he was physically free to leave agent Layman's office at any time during questioning. *See* Bowers' brief at

---

3. There was clear evidence that the real "Mama's Clue" had been sent to the glue factory or to be used as feed after finishing last and

next-to-last in its only races. Damon Runyon may have wished to use the facts in this case in one of his racetrack stories.

20. Thus, Bowers was not in custody within the meaning of *Miranda*. Moreover, the *Miranda* rules generally do not restrain private non-police actors. *See United States v. Antonelli*, 434 F.2d 335 (2d Cir. 1970) (private security guards); *United States v. Birnstihl*, 441 F.2d 368 (9th Cir. 1971) (per curiam) (store security officer); *United States v. Bolden*, 461 F.2d 998 (8th Cir.1972) (per curiam) (same); *United States v. Casteel*, 476 F.2d 152 (10th Cir. 1973) (employees of private security firm). Defendant does not argue that Layman was an agent of the state, or that he was a law enforcement officer.

Bowers also claims that his statement should have been suppressed on the strength of *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). In *Garrity*, the state was investigating claims of misconduct in the police department. Police officers being questioned regarding the investigation were told that they did not have to answer questions, but they were also affirmatively advised that failure to answer the questions would result in their termination from employment. *Id.* at 494, 87 S.Ct. at 617. To avoid termination, the officers answered questions; those answers were subsequently introduced at the officers' trial. The Court held that the statements should be suppressed even though the police officers had not followed the usual procedure of invoking the Fifth Amendment privilege instead of answering questions.

■ Unlike the defendants in *Garrity*, Bowers was not told by agent Layman that he would be disciplined if he refused to answer questions. In fact, Layman testified that discipline would not necessarily have followed had Bowers refused to cooperate. *See* Transcript at 410–11. This case therefore falls within the teaching of *Garner v. United States*, 424 U.S. 648, 662, 96 S.Ct. 1178, 1186, 47 L.Ed.2d 370 (1976) (distinguishing *Garrity* as a case in which defendants were threatened with punishment that could have been administered). *See also Minnesota v. Murphy*, —— U.S. ——, at ——, 104 S.Ct. 1136, at 1148, 79

L.Ed.2d 409 (1984) (same); *United States v. Solomon*, 509 F.2d 863, 872 (2d Cir.1975) (same). The statement at issue was therefore properly admitted.

### C.

Defendants were charged with conspiracy to violate 18 U.S.C. § 2314 by transporting a certificate of foal registration. The section proscribes the transportation in interstate commerce of "any falsely made, forged, altered, or counterfeited securities." *Id.* For purposes of § 2314, a "security" includes any "certificate of interest in property, tangible or intangible" and any "instrument or document or writing evidencing ownership of goods, wares, and merchandise." *Id.* § 2311.

The scheme charged in this case involved presenting a poor horse's certificate (in this case also a dead horse) and claiming that it accurately represented the record of another superior horse, whose true identity was deliberately concealed. Falsification of the certificate itself was not necessary to accomplish the scheme; an entirely accurate certificate could have been used and the scheme still accomplished by representing that the certificate described a horse that it actually did not. In an attempt to cover their tracks, however, the conspirators here falsified the ownership record listed on the certificate. The government relies on this falsification in support of the conviction. Bowers argues, on the other hand, that the misstated ownership on the certificate does not bring the certificate within the reach of § 2314. He cites the Kentucky rules of racing, which do not require the certificate to bear an ownership record, and argues that the certificate was "complete" before falsification of the ownership aspect of the certificate; he maintains that the statute therefore does not apply under the reasoning of *United States v. Simpson*, 577 F.2d 78 (9th Cir.1978), and *Streett v. United States*, 331 F.2d 151 (8th Cir.1964).

■ *Simpson* and *Streett*, however, do not control here. Those cases dealt with forged endorsements on stolen stock certificates and traveler's checks. While the peculiar characteristics of those instru-

ments might justify their characterization as "complete" without an endorsement, the certificate at issue here serves different purposes. Although a listing of ownership might not be legally required on certificates of foal registration in Kentucky, evidence at trial provided a sufficient basis for the conclusion that the certificates normally are required to set out a complete and accurate record of ownership. *See* Transcript at 171–72, 889. Given that one accepted purpose of the certificate is to act as a "certificate of interest in property," 18 U.S.C. § 2311, the document here could not be considered complete without the ownership record; and falsification of that record therefore properly triggers application of § 2314. The certificate in question here sets out as owner a defendant who was not and also intentionally set out false names of other purported owners; moreover, it did not accurately set out the real horse's true track record.

### V.

Accordingly, finding none of the errors asserted as having merit, the convictions of defendants Bowers and Oakes are affirmed.