953 F.2d 645
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rameshbhai F. PATEL, M.D., Defendant-Appellant.
 No. 90-2264.
 United States Court of Appeals, Sixth Circuit.
 Jan. 24, 1992.
 
 Before KEITH and DAVID A. NELSON, Circuit Judges, and HOOD, District Judge.*
 PER CURIAM.
 
 
 1
 This is a criminal case that arises out of the alleged operation of a prescription mill by the defendant, Rameshbhai F. Patel, M.D. Dr. Patel was charged with conspiring to distribute Schedule II-V controlled drugs in violation of 21 U.S.C. §§ 841(a)(1) and 846 and with using the mails to defraud health insurers in violation of 18 U.S.C. § 1341. The government also sought forfeiture of the doctor's automobile under 21 U.S.C. § 812(b).
 
 
 2
 At trial the government opted not to present any evidence of a conspiracy to distribute Schedule II drugs. Dr. Patel moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, arguing that there had been an impermissible variance from the indictment. The district court denied the motion.
 
 
 3
 During closing arguments, the defendant's lawyer attacked the credibility of a government witness on the basis of a defense exhibit. The government then moved to reopen the case for the purpose of putting into evidence a portion of the exhibit not previously admitted. The court granted the motion.
 
 
 4
 The jury ultimately returned a verdict of guilty. In appealing his conviction, Dr. Patel makes two arguments: (1) that the district court erred in permitting the government to reopen its case during closing arguments to introduce additional evidence; and (2) that the district court erred in not granting the motion for acquittal. Finding neither argument persuasive, we shall affirm the conviction.
 
 
 5
 * Dr. Patel operated a medical office in Flint, Michigan, from 1983 to 1988. The government's evidence showed that a number of his patients made office visits to receive prescriptions for controlled drugs, and that it was the doctor's practice to issue such prescriptions without conducting proper medical examinations. A patient had only to describe a claimed ailment in order to obtain the desired prescription. A former employee of Dr. Patel testified that if a patient stated that he was nervous, he got Valium; if he indicated that he had a headache, he would receive Tylenol 4; if he said that he had a cough, he would receive the heavy-duty cough syrup Ambenyl. Dr. Patel's patients often instructed him to issue them prescriptions for these substances in fictitious names.
 
 
 6
 Substantially all of Dr. Patel's patients had their prescriptions filled at a nearby pharmacy operated by a co-defendant. Dr. Patel would either write out the prescription and direct the patients to the pharmacy or simply pick up the phone, which was connected to the pharmacy by a direct line, and order the drugs that way. The patients would either use the drugs themselves or sell them. Not infrequently, the drugs were sold right in front of the pharmacy.
 
 
 7
 There is a large market for the illegal sale of prescription drugs, and Dr. Patel told his patients to tell their friends about him. Each office visit cost the patient about $20 initially, and that figure was eventually increased to $30. One defendant estimated that the fees Dr. Patel took in from patients amounted to approximately $1,000 per day. Dr. Patel also billed health insurance providers for medical tests that were, in many cases, unnecessary. Some patients were subjected to exactly the same test several times without any medically justifiable reason.
 
 
 8
 When the government rested its case, Dr. Patel moved for a judgment of acquittal. He argued, among other things, that the government had failed to establish a conspiracy to distribute Schedule II drugs, and that this constituted a variance from the indictment that was prejudicial per se. The government responded that it had purposely omitted any evidence on Schedule II drugs because it thought that the proof was not as strong on these drugs as on Schedule III through V drugs. The trial court concluded that the absence of any evidence on Schedule II drugs amounted to nothing more than a failure to prove that the conspiracy was as wide as the government had claimed, and that this did not constitute a fatal variance. The court also found that there was no prejudice to the defendant. The court carefully instructed the jury that there was no evidence of Schedule II drugs.
 
 
 9
 One of the government's witnesses had been a man named Johnny Henderson. Henderson went to Dr. Patel primarily to receive written excuses from work on medical grounds. Henderson was not sick, but he sometimes wanted to miss work and needed a valid excuse for doing so. Henderson testified that on some occasions he went to Dr. Patel's office, paid his $20 office visit fee, and received excuses after being examined by Dr. Patel for only four to five minutes.
 
 
 10
 When Henderson was unable to answer a certain question on cross-examination, he suggested that the lawyer check the excuses with his employer. The employer no longer had them, but records subsequently obtained from the employer's insurance carrier proved to contain excuses from two other physicians; there was none from Dr. Patel. After they had been examined by the government, the records were marked as a defense exhibit and introduced into evidence.
 
 
 11
 During closing arguments, the government adverted to Henderson's testimony that he had received medical excuses from Dr. Patel even though he was not sick. Dr. Patel's lawyer responded by attacking Henderson's credibility. He argued that Henderson must have lied about receiving excuses from Dr. Patel, because no such excuse was contained in the defense exhibit.
 
 
 12
 Prior to rebuttal the government moved to reopen its case to introduce an excuse from Dr. Patel that had been obtained through a pretrial subpoena to Henderson's employer. The U.S. attorney stated that he had been under the impression that the excuse would be included in the exhibit offered by defense counsel. The defense counsel replied that he never intended to indicate that he would include this particular excuse.
 
 
 13
 It was agreed by the court, the government, and the lawyer who had obtained the records that the excuse from Dr. Patel had at one time been a part of the records comprising the defense exhibit. The trial judge said that he was mainly concerned with the accuracy of the exhibit, and he invited each lawyer to suggest how the matter should be handled. Dr. Patel's lawyer indicated that the admission of the excuse would be detrimental to his client because he had already argued to the jury that the excuse did not exist and that Henderson had lied about it.
 
 
 14
 The court then decided that the government could reopen its case and introduce the excuse signed by Dr. Patel, but that the defense attorneys who had attacked Henderson's credibility could supplement their closing arguments if they wished. The court instructed the jury that the excuse signed by Dr. Patel should be given no more weight than any other piece of evidence.
 
 
 15
 After deliberation, the jury found the defendants guilty. The court sentenced Dr. Patel to a fine and to imprisonment for five years, followed by three years of supervised release. Dr. Patel has perfected a timely appeal.
 
 II
 
 16
 Dr. Patel argues first that the district court abused its discretion in permitting the government to reopen its case. We reject the argument.
 
 
 17
 A decision to permit a case to be reopened is committed to the trial court's sound discretion. United States v. Blankenship, 775 F.2d 735, 740 (6th Cir.1985).
 
 
 18
 "In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of granting the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case in chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused." Id. at 741, quoting United States v. Thetford, 676 F.2d 170, 182 (5th Cir.1982), cert. denied, 459 U.S. 1148 (1983).
 
 
 19
 All of the factors mentioned in Blankenship and Thetford were considered here, and none of them compels the conclusion that it was an abuse of discretion to permit the case to be reopened. The motion to reopen was made promptly after defense counsel argued that Henderson had lied about getting excuses from Dr. Patel. The evidence sought to be introduced was relevant, technically adequate, and helpful to the jury in evaluating the question of guilt or innocence. The government had a reasonable explanation for its failure to offer the evidence earlier.
 
 
 20
 The court instructed the jury not to give undue weight to the new evidence, moreover, and the defendants were allowed to correct or add to their previously concluded closing arguments. The fact that the reopening of the case came during closing arguments is not controlling. See United States v. Cohen, 888 F.2d 770 (11th Cir.1989) (government could reopen its case during closing arguments to rebut argument as to a witness' motivation in testifying).
 
 III
 
 21
 "A variance occurs when the proof introduced at trial materially differs from the facts alleged in the indictment." United States v. Beeler, 587 F.2d 340, 342 (6th Cir.1978). A variance requires reversal only when it results in prejudice to the defendant. United States v. Bowers, 739 F.2d 1050, 1053 (6th Cir.), cert. denied, 469 U.S. 861 (1984). Variances are subject to analysis under the harmless error rule, except where there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment. Beeler, 587 F.2d at 342.
 
 
 22
 In the case at bar the failure of the government to show that Dr. Patel conspired to distribute Schedule II drugs was harmless. There was no evidence of any offense not charged in the indictment, and the government simply chose not to present evidence on the entire spectrum of drugs cited in the indictment. This was not grounds for acquittal. See Bowers, 739 F.2d at 1053 (failure to prove a conspiracy as comprehensive as that charged in the indictment did not prejudice the defendant); see also U.S. v. Corpus, 882 F.2d 546 (1st Cir.1989), cert. denied, 493 U.S. 958 (1989), and cert. denied, 110 S.Ct. 3251 (1990) (indictment charging possession of a larger quantity of drugs than that proved at trial did not render the indictment constitutionally infirm).
 
 
 23
 We are satisfied that the jury did not find Dr. Patel guilty of any offense on the basis of Schedule II drugs having been involved. In its instructions to the jury, the district court noted several times that there was no proof that Schedule II drugs had been distributed.
 
 
 24
 AFFIRMED.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation