UNITED STATES of America

v.

Victoriano MOLINA–CHACON, Gaetano Giuffrida, Trinitario Ruiz-Saura, Theresa Ruiz, Anthony C. Castelbuono, Melania Lopez, Rudolfo Risatti, Francis DiTommaso, Salvatore Messina, and Sheila Silvetti, Defendants.

No. 85 CR 168 (S–3).

United States District Court, E.D. New York.

Jan. 27, 1986.

See also 625 F.Supp. 338.

Raymond J. Dearie, U.S. Atty., E.D. New York, Brooklyn, N.Y. by Carol B. Schachner and Ephraim Savitt, for the Government.

Schulman & Laifer, Brooklyn, N.Y. by Barry E. Schulman, for defendant Molina-Chacon.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This Court is called upon once again to decide several motions submitted by defendant Victoriano Molina-Chacon in this multi-defendant, international, multi-million dollar heroin conspiracy and money laundering case. Molina-Chacon seeks the suppression of certain physical evidence seized from him upon his arrest in Bermuda as well as the suppression of certain statements made by him subsequent to his arrest. Additionally, Molina-Chacon, citing *United States v. Rauscher*, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), seeks the dismissal of counts in the current superseding indictment on the grounds that they exceed the permissible indictable crimes specified in his "extradition." For the reasons discussed in this opinion, all of the motions of the defendant must be denied.

### I. *Background*

Based upon the documents and memoranda submitted to this Court as well as the testimony given at a pre-trial suppression hearing held on November 19 and 20, 1985, the Court finds the following to be the facts of the case.

Victoriano Molina-Chacon and others were the subject of a long investigation conducted in the Eastern District of New York and elsewhere concerning their involvement in heroin trafficking and money laundering. By January of 1985 this investigation had convinced agents of the United States Drug Enforcement Administration ("DEA") of Molina-Chacon's substantial involvement in criminal activities. An arrest warrant for Molina-Chacon was obtained from United States Magistrate John L. Caden on January 21, 1985 in the Eastern District of New York for the crime of conspiracy to import heroin into the United States. At that time Molina-Chacon was somewhere overseas beyond the jurisdiction of United States law enforcement personnel. An undercover operation was conceived whereby agents of the DEA would meet Molina-Chacon in Bermuda and secure his apprehension there.

Sometime in February of 1985, Special Agent Kevin Gallagher, the DEA's liaison with Bermudian authorities, communicated with Detective Inspector John L. Williams, who was the head of the narcotics section of the Bermuda Police Force. Agent Gallagher told Inspector Williams of the existence of the outstanding warrant for Molina-Chacon as well as the desire of the DEA to send agents to Bermuda to further their investigation of this case. Prior to this point in time, Inspector Williams knew absolutely nothing about the American investigation. Inspector Williams relayed this request to the Attorney General of Bermuda, Saul M. Froomkin, and the Commissioner of Bermuda's Police, Frederick Bean. A decision was made to permit the United States to send DEA agents to Bermuda to further their investigation of Molina-Chacon.

On Thursday, February 28, 1985, Special Agents Lucille Lanzar and Joel Gutensohn arrived in Bermuda with the arrest warrant that had been signed by Magistrate Caden. Inspector Williams took the United States warrant to Attorney General Froomkin and a request for a provisional arrest warrant was drawn up. This request was granted by Bermudian Magistrate Ephraim Georges on Friday, March 1, 1985.

The next day, Saturday, March 2, 1985, Inspector Williams drove Agents Lanzar and Gutensohn to Bermuda's airport to watch for the arrival of Molina-Chacon. After deplaning, Molina-Chacon took a taxi, which Inspector Williams and the agents followed, to the Elbow Beach Hotel. Shortly after arriving at the hotel, Molina-Chacon went to the Seahorse Bar and Grill (located in the lower level of the Elbow

Beach Hotel) and met with DEA Special Agents Art Reed and Frank Fernandez (they had arrived separately in Bermuda), who were acting in an undercover capacity. Agents Lanzar and Gutensohn also joined this meeting in an undercover capacity while Inspector Williams observed the entire group out of earshot. After the conclusion of the March 2nd meeting, Agents Lanzar and Gutensohn informed Inspector Williams that another undercover meeting with Molina-Chacon would take place in the late afternoon of March 3rd and that Inspector Williams should bring the provisional arrest warrant with him to the Elbow Beach Hotel in order to effect Molina-Chacon's arrest.

On Sunday, March 3, 1985, Molina-Chacon met again with the group of undercover DEA agents in the Seahorse Bar and Grill. At this time Inspector Williams was waiting in the lobby of the Elbow Beach Hotel along with Detective Sergeant Winston Esdaille of the Bermuda Police. After meeting for about an hour in the Seahorse Bar and Grill, the DEA agents led Molina-Chacon to the lobby of the hotel. At this point, Inspector Williams, through the translation into Spanish by Agent Fernandez, identified himself to Molina-Chacon as a Bermudian Police Official and informed him of his possession of a provisional arrest warrant.

Inspector Williams told Molina-Chacon (through Agent Fernandez's translation) that he was not obligated to say anything unless he wished to do so and that anything he said would be written down and used in evidence. Inspector Williams took possession of an attache case which Molina-Chacon was carrying and led him to an unmarked police vehicle. Molina-Chacon made no significant statements at this time other than "thanking" the agents.

Molina-Chacon was placed in a car along with Inspector Williams and Agents Gutensohn and Fernandez. Agents Lanzar and Reed followed in a second car operated by Sergeant Esdaille. En route to the Hamilton Police Station, Agent Gutensohn orally advised Molina-Chacon of his *Miranda* rights, which were translated into Spanish by Agent Fernandez. Molina-Chacon said he understood his rights and that he had not done anything.

Upon arrival at the Hamilton Police Station, Molina-Chacon was processed by the Bermuda Police which included a search of his person for valuables and other items, at which point his wallet was taken. Inspector Williams asked Agent Fernandez to read in Spanish to Molina-Chacon a "notice to prisoners" form which apparently is a statement of the rights which arrestees have under the law of Bermuda. Agent Fernandez translated the document but, being distrustful of Agent Fernandez's translation, Molina-Chacon refused to sign it.

After the initial processing by the Bermuda Police, Agent Lanzar asked Inspector Williams if she could question Molina-Chacon to obtain some biographical information for DEA files. Inspector Williams provided Agent Lanzar with a blank personal history form utilized by the Bermuda Police and access to an interview room for this purpose. Agents Lanzar and Fernandez entered this room with Molina-Chacon. Agent Fernandez translated into Spanish the *Miranda* warnings from a standard DEA form. Molina-Chacon stated that he understood his rights and that he had done nothing illegal. At this point Agent Lanzar, with Agent Fernandez translating, asked Molina-Chacon various biographical background questions. After obtaining the pedigree information, Agent Lanzar asked Molina-Chacon whether he knew Antonio Turano and Gaetano Giuffrida, two other individuals suspected of narcotics trafficking. Molina-Chacon described his association with these individuals in various business ventures, related that he suspected their being involved in illegal activities, but denied any personal involvement in heroin trafficking. This ended the conversation with the agents.

At some point during the events at the Hamilton Police Station that day, Inspector Williams allowed DEA agents to photocopy documents which were contained in the attache case and wallet seized from Molina-

Chacon. The originals remained in Bermudian custody as well as the wallet and attache case themselves. The DEA agents left for the United States the next day, Monday, March 4, 1985.

Molina-Chacon, meanwhile, remained in the custody of the Bermudian authorities. On the morning of March 4, 1985, Inspector Williams communicated with the Spanish Consul to Bermuda, a Mrs. Dean, and informed her that he had a Spanish National (Molina-Chacon) in custody. According to Inspector Williams, the purpose of this communication was to have the Spanish Consulate attend to any "humanitarian needs" Molina-Chacon might have. Inspector Williams offered to have the Bermuda Police's Spanish interpreter, a Colombian woman, meet with Molina-Chacon but Mrs. Dean rejected this idea. Instead, Mrs. Dean insisted that Molina-Chacon be seen by Jose Perez-Vivas, a Spanish citizen fluent in English and Spanish who resided in Bermuda, where he conducted an importing and distribution business. Inspector Williams had never dealt with Mr. Perez-Vivas before but he agreed to communicate with him to ascertain whether he would see Molina-Chacon on behalf of the Spanish Consul.

The next morning, March 5, 1985, Inspector Williams went to Perez-Vivas's office and explained the situation to him. Perez-Vivas readily agreed to meet with Molina-Chacon and asked Inspector Williams to drive him to his residence so that he could obtain his Spanish passport and other documents in order to prove his Spanish citizenship to Molina-Chacon. Parenthetically, it bears mentioning that Mr. Perez-Vivas accepted no fee for his services to the Spanish Consul. Apparently, Mr. Perez-Vivas considers the occasional translation work he does for the Spanish Consul, Bermudian government agencies and other organizations to be a public service for which he seeks no compensation.

After obtaining his Spanish documents, Perez-Vivas went with Inspector Williams to the Hamilton Police Station. Inspector Williams brought Perez-Vivas to an interview room where Molina-Chacon was held and introduced the two. Inspector Williams (through Perez-Vivas's translation) again informed Molina-Chacon that he was not obligated to say anything unless he wished to do so and that anything he did say would be taken down in writing for evidence. Perez-Vivas displayed his Spanish documentation to Molina-Chacon and the two began to converse. Inspector Williams remained in the room and Perez-Vivas translated what Molina-Chacon was saying and took notes. Perez-Vivas and Molina-Chacon had a wide-ranging discussion which initially involved topics of family, Spain and Molina-Chacon's shoe business. Molina-Chacon also spoke of monetary transactions in the United States and mentioned the first names of various individuals. Most significantly, Molina-Chacon mentioned a 2.4 million dollar transaction in New York which involved a lawyer named "Tony Castelbuono" (a co-defendant in this case). When first names were mentioned by Molina-Chacon, Inspector Williams asked for clarification of identities, which Molina-Chacon did not provide. These were apparently the only questions asked by Inspector Williams, the lion's share of the questioning came directly from Perez-Vivas. At one point, Inspector Williams left the room to try to communicate with the DEA in New York to inform them of the then occurring conversation. The entire session lasted for about one hour. At the conclusion of the conversation Inspector Williams asked for and received Perez-Vivas's notes and obtained Perez-Vivas's agreement to act as Molina-Chacon's interpreter at an appearance before a Bermudian Magistrate later that day. Inspector Williams subsequently telephoned Agent Lanzar in New York and relayed the statements Molina-Chacon had made to Perez-Vivas.

On the afternoon of March 5, 1985, Molina-Chacon was brought before a Bermudian Magistrate. With Perez-Vivas serving as interpreter the Magistrate informed Molina-Chacon of the charges against him. Through Perez-Vivas, Molina-Chacon informed the Magistrate of his desire to go

to the United States to face his charges. The Bermudian Magistrate remanded Molina-Chacón into custody pending the preparation of a waiver of extradition.

The Bermudian Attorney General, Saul M. Froomkin (who was also during the time in question the acting Deputy Governor of Bermuda), prepared a waiver and consent to extradition as well as a deportation order. Molina-Chacon was brought before a Bermudian Magistrate a second time, on March 11, 1985, and, with Perez-Vivas again acting as interpreter, the Magistrate read to Molina-Chacon the contents of the waiver and consent to extradition. After the Magistrate explained to Molina-Chacon in lay terms that signing the waiver was not an admission of guilt Molina-Chacon signed the waiver, which said in pertinent part: "I, Victoriano Molina Chacon ... hereby freely and voluntarily waiver and forego all my rights under The Extradition Act 1870...."

It should also be noted that at neither appearance before the Bermudian Magistrates was counsel present for Molina-Chacon. However, the Spanish Consul had retained a barrister, Brian Smedley, to represent Molina-Chacon. Mr. Smedley had apparently visited Molina-Chacon while he was in custody. There is no indication that Mr. Smedley was dissatisfied with the proceedings involving Molina-Chacon or that his representation of Molina-Chacon was somehow incompetent under the law of Bermuda.

On March 12, 1985, Molina-Chacon was taken to the Bermuda airport by Inspector Williams. Inspector Williams released Molina-Chacon into the custody of a United States Marshal and boarded the plane with them. He also brought along the attache case and wallet seized from Molina-Chacon. Upon his arrival in New York, Inspector Williams turned over the attache case and wallet to DEA agents.

## II. *Discussion*

### A. *The Wallet and Attache Case*

Molina-Chacon seeks the suppression of the contents of the wallet and attache case seized from him in Bermuda.[1] He contends that these seizures were performed by Bermudian authorities at the behest of the DEA for the express purpose of obtaining evidence for a United States prosecution, in violation of the Fourth Amendment. He further maintains that his privacy interests in these items outweigh any of the factors typically used to sustain inventory searches.

■ In view of the facts of this case, these arguments must fail. To begin with, it is clear from the record that the seizure of the attache case and wallet was done by *Bermudian* police officials. It is a well accepted principle of American law that the requirements of the Fourth Amendment do not apply to foreign searches by foreign officials:

> It is obvious and the decisions have therefore recognized, that since United States courts cannot be expected to police law enforcement practices around the world, let alone to conform such practices to Fourth Amendment standards by means of deterrence, the exclusionary rule does not normally apply to foreign searches conducted by foreign officials.

*United States v. Mount*, 757 F.2d 1315, 1317 (D.C.Cir.1985) (citations omitted).

The Second Circuit has recognized two exceptions to this general rule. If the circumstances of the foreign search were such that they "shocked the judicial conscience," then the evidence thereby obtained might be excluded. *Stowe v. Devoy*, 588 F.2d 336, 341 (2d Cir.1978), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2862, 61 L.Ed.2d 299 (1979); *United States v. Cotroni*, 527 F.2d 708, 712 n. 10 (2d Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976); *United States v. Na-*

1. Some sort of suitcase belonging to Molina-Chacon was also seized from the hotel by the Bermuda Police. However, it appears that this piece of luggage only contained clothes, none of which have any evidentiary value to the parties in these proceedings.

*gelberg,* 434 F.2d 585, 587 n. 1 (2d Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). The circumstances of this case clearly do not warrant such a finding. Molina-Chacon suffered no mistreatment by Bermudian officials and, indeed, it seems that Inspector Williams scrupulously honored Molina-Chacon's rights under the law of Bermuda.

A second exception would be a situation where the United States officials were involved to such an extent in the search and seizure that the foreign officials could be considered agents of the United States. *United States v. Toscanino,* 500 F.2d 267, 280 n. 9 (2d Cir.1974). The Second Circuit has expressly reserved decision on the precise test to be employed in determining whether a "joint investigation" with foreign authorities has reached the point where the strictures of the Fourth Amendment must be applied to the foreign officials. *United States v. Paternina-Vergara,* 749 F.2d 993, 998 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Busic,* 592 F.2d 13, 23 n. 7 (2d Cir.1978).

Other courts have dealt with this "joint investigation exception." The Ninth Circuit in *Stonehill v. United States,* 405 F.2d 738, 743 (9th Cir.1968), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969), established the following test:

> Thus, the Fourth Amendment could apply to raids by foreign officials only if Federal agents so substantially participated in the raids so as to convert them into joint ventures between the United States and the foreign officials.

Other Circuits have established seemingly more lenient standards. In *Birdsell v. United States,* 346 F.2d 775, 782 (5th Cir.), *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965), the Fifth Circuit stated:

> [T]heir reasoning, that the United States is bound by the Bill of Rights wherever it acts, is inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials were present and cooperated in some degree.

This Court need not attempt, however, to predict what particular test or standard the Second Circuit might adopt in construing the joint investigation exception to the principle that the Fourth Amendment does not apply to foreign searches by foreign officials. No matter what the phraseology employed by the various federal courts, the result, as the Second Circuit has noted, has been almost uniformly the same:

> There exists no case, so far as we are aware, which suppresses evidence obtained in a foreign country under such conditions, regardless of whether the foreign officers failed to follow American constitutional procedures or of the extent to which American agents may have been involved in their activities. The courts can hardly be said to have spoken with one voice in articulating the reasons for their decisions, but as a statistical matter they have apparently been unanimous in rejecting attempts to suppress the challenged foreign evidence.

*Stowe,* 588 F.2d at 342.

■ The implication is clear that a federal court must look at the particular facts of each case involving a search or seizure by foreign officials and make a determination whether the application of the Fourth Amendment and its attendant exclusionary rule is worthwhile. The guiding principle is that the exclusionary rule is not a constitutional right of an individual but rather a judicially created device to deter United States police misconduct, to be applied only in those situations where this objective can be achieved. *United States v. Janis,* 428 U.S. 433, 446–47, 96 S.Ct. 3021, 3028–29, 49 L.Ed.2d 1046 (1976).

The facts of this case do not warrant the application of the exclusionary rule and the suppression of the items seized by the Bermudian authorities. There is simply no evidence of misconduct by United States agents or the Bermudian officials and no indication that suppression here would serve a deterrent purpose. *See United States v. Rose,* 570 F.2d 1358, 1362 (9th Cir.1978); *United States v. Morrow,* 537 F.2d 120, 140 (5th Cir.1976), *cert. denied,*

430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977).

■ It is true that the Bermudian authorities were acting subsequent to a request for assistance by the United States and had no prior knowledge of the investigation. However, the mere fact that a foreign search or seizure is prompted by information from United States officials is not sufficient justification to apply the Fourth Amendment. *See United States v. Wolfish,* 525 F.2d 457, 463 (2d Cir.1975), *cert. denied,* 423 U.S. 1059, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976); *Brulay v. United States,* 383 F.2d 345, 348 (9th Cir.), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967).

The fact that Agent Fernandez interpreted for the Bermudian authorities does not require application of the exclusionary rule. *See Birdsell,* 346 F.2d at 782 n. 11 (Texas Deputy Sheriff interpreted for Mexican Customs authorities). The fact that United States agents were present during the seizure and were allowed to photocopy the documents seized does not require the application of the exclusionary rule. *See Stonehill,* 405 F.2d at 741–42 (IRS officials copied documents seized in illegal Philippine raid). The eventual turning over of the attache case to United States authorities also does not require the application of the exclusionary rule. *See Busic,* 592 F.2d at 23 (French authorities turned over flight bag to United States officials). In sum, nothing in the facts of this case is so out of the ordinary or egregious as to require the suppression of the evidence seized.

It is an unfortunate phenomenon that modern day narcotics trafficking is conducted on a global scale with the dealers or traffickers frequently crossing national boundaries. It is to be expected that United States law enforcement agencies will have to enlist the cooperation of their counterparts in other parts of the world. This international cooperation does not mandate the conclusion that the assistance rendered by foreign officials thereby makes them agents of the United States and thus subject to our Constitution and jurisprudence.

It may not be expected that foreign law enforcement officials will be familiar with our legal system. To impose such an onerous burden would unduly hamper cooperative international efforts to stem the flow of narcotics that are poisoning our nation's youth.

Of course, United States courts must guard against those rare situations where overzealous United States law enforcement personnel attempt to use foreign officials to circumvent constitutional safeguards. The present case, where United States officials request that their counterparts in another country apprehend a criminal wanted by the United States and transport him to the United States in accordance with that country's laws, is not such a situation.

The facts of this case are strikingly similar to those in *United States v. Marzano,* 537 F.2d 257 (7th Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977), where a defendant also attempted to suppress evidence seized by a foreign police official. In *Marzano,* the FBI requested the assistance of the Detective Superintendent of Grand Cayman Island in apprehending an individual wanted for a major theft in the United States. The Detective Superintendent allowed the FBI agents to accompany him but he personally took the defendant into custody, seized items from the defendant and placed him on a plane to the United States. The FBI agents had no weapons and had no jurisdiction in Grand Cayman Island, their presence was simply at the good graces of their host, the Detective Superintendent. The Court held that no purpose would be served by excluding the evidence turned over to the FBI by the Detective Superintendent.

The present case is much the same. The agents had no weapons or jurisdiction in Bermuda. Their presence was totally in the control of Inspector Williams. Inspector Williams was far from an "agent" of the Americans, rather he was a host overseeing the presence of the DEA and controlling their limited actions on his island. As the Inspector testified:

Mr. Schulman: Would you say you were assisting in the surveillance?

Inspector Williams: I didn't consider that to be my function at that time.

Mr. Schulman: Well, what were you doing at that time?

Inspector Williams: To use a phrase to make sure the wheel didn't come off, I was there to make sure that they didn't do anything illegal in my country and to make sure that they followed the laws and the procedures.

Mr. Schulman: You were keeping an eye on the agents?

Inspector Williams: Yes, to make sure that they didn't do anything that was illegal in Bermuda.

Record at 342.

■ The Court concludes that the Bermudian officials were not acting as mere agents of the Americans and therefore the Fourth Amendment does not apply to the seizure in question. The attache case, wallet and their contents will not be suppressed. We should also make it clear that, even assuming *arguendo* that the Fourth Amendment did apply to this seizure, it would be lawful both as a search incident to a lawful arrest and a valid inventory search. *See Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *United States v. Eatherton*, 519 F.2d 603 (1st Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304 (1975).

### B. *Molina-Chacon's Statements to Agents Lanzar and Fernandez*

The statements made by Molina-Chacon to Agents Lanzar and Fernandez at the Hamilton Police Station following his arrest require little discussion. The record indicates that Molina-Chacon had twice been advised of his rights pursuant to *Miranda* prior to his questioning by Agent Lanzar. There is nothing in the record to suggest that the translation of the *Miranda* warnings into Spanish by Agent Fernandez was not adequate and there is also no reason to question Molina-Chacon's understanding of the warnings. It should also be noted that much of Agent Lanzar's questioning involved pedigree information. Questions as to pedigree are not considered interrogation and do not require *Miranda* warnings. *United States ex rel. Hines v. La Vallee*, 521 F.2d 1109, 1113 n. 2 (2d Cir.1975), *cert. denied*, 423 U.S. 1090, 96 S.Ct. 884, 47 L.Ed.2d 101 (1976); *United States v. Badr*, 604 F.Supp. 569, 578 (E.D. N.Y.1985). The statements will not be suppressed.

### C. *Molina-Chacon's Meeting With Perez-Vivas*

Molina-Chacon also seeks the suppression of statements given during the course of his conversation with Perez-Vivas on March 5, 1985. He alleges that no *Miranda* warnings were given on that day prior to the conversation and that the entire session was a custodial interrogation at the behest of the United States.

For the moment, we will assume that Molina-Chacon was indeed not fully informed of his rights and that Perez-Vivas was conducting a custodial interrogation as an agent of the Bermuda Police.[2] Even under these assumptions it is clear that the statements in question should not be suppressed. The analysis here is much the

---

**2.** The Court sees no reason to address Molina-Chacon's argument concerning the gap in time between the *Miranda* warnings given by the DEA agents at the Hamilton Police Station and his discussion with Perez-Vivas, except to say that where the warnings were given, as here, in defendant's native language, twice, by U.S. officers and defendant said he understood them in each instance on the day of his arrest, it would scarcely seem necessary that they be repeated *in haec verba* three days later when he was talked to again by a Bermudian official, even if it be

assumed *arguendo* that the latter was then acting at the instance of the U.S. authorities. The Bermudian abbreviated warning given to him at the later interview that he need not say anything and that anything he said would be taken down in writing for evidence, would seem to us to be an ample reminder of the rights that he said he understood he had. Of course, as indicated in the text, in this case the statements need not be suppressed even if Molina-Chacon had not received adequate warnings.

same as that undertaken with regard to the suppression of the contents of Molina-Chacon's wallet and attache case.

■ Just as it is true that the Fourth Amendment with its exclusionary rule does not generally apply to searches conducted by foreign officials, so too do the *Miranda* warnings attendant to the Fifth Amendment generally not apply to interrogations conducted by foreign officials. *Cotroni*, 527 F.2d at 711; *United States v. Trenary*, 473 F.2d 680, 681–82 (9th Cir.1973); *Kilday v. United States*, 481 F.2d 655, 656 (5th Cir.1973); *United States v. Welch*, 455 F.2d 211, 213 (2d Cir.1972); *United States v. Chavarria*, 443 F.2d 904, 905 (9th Cir. 1971).

Once again there are two exceptions to this general principle. Statements obtained by foreign officials under circumstances that shock the judicial conscience will be suppressed. *Nagelberg*, 434 F.2d at 587 n. 1. The "interrogation" conducted by Perez-Vivas and Inspector Williams involved no mistreatment of Molina-Chacon and thus this exception does not apply to the present case.

There also appears to be a "joint investigation" exception such that if United States authorities participated in the interrogation in order to utilize foreign officials as their agents to circumvent the requirements of *Miranda*, the statements obtained will be suppressed. *See United States v. Heller*, 625 F.2d 594, 599 (5th Cir.1980); *Trenary*, 473 F.2d at 682; *Welch*, 455 F.2d at 213. As in the case with the Fourth Amendment, the Second Circuit has expressly reserved decision on the precise test to be employed in determining whether a "joint investigation" with foreign authorities requires the use of *Miranda* warnings. *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983).

As we did with the exclusionary rule of the Fourth Amendment, this Court will not attempt to predict what should be the test for applying the joint investigation exception with regard to the *Miranda* warnings

of the Fifth Amendment. The proper procedure is to make a case-by-case determination of whether the imposing of a requirement of giving *Miranda* warnings upon foreign officials is worth while in achieving the goals of *Miranda*.

■ It is clear that the *Miranda* warnings, like the exclusionary rule of the Fourth Amendment, are not individual constitutional rights in and of themselves. Rather, they are a judicially created device designed to deter unlawful police conduct, in this instance coercive interrogation which infringes on the right against self-incrimination. *See New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2631, 81 L.Ed.2d 550 (1984). The question in a case involving statements or confessions obtained by foreign police officials is whether imposing the *Miranda* requirements will deter unlawful interrogation by foreign officials. *See Kilday*, 481 F.2d at 656; *Welch*, 455 F.2d at 213; *Chavarria*, 443 F.2d at 905.

■ In the present case there is no indication of any misconduct on the part of United States or Bermudian officials and the imposition of *Miranda* requirements would serve no legitimate purpose. The record shows that the United States had no advance notice of the meeting between Molina-Chacon, Perez-Vivas, and Inspector Williams. Nothing in the record indicates that the DEA had requested Inspector Williams to interview Molina-Chacon to develop further information. The actions of Inspector Williams were totally independent and apparently out of a motivation to attend to Molina-Chacon's humanitarian needs, not to develop information for the DEA.

The DEA could not be responsible for the independent actions of Inspector Williams. It was certainly not the case here that Inspector Williams and Perez-Vivas were "agents" of the United States in a joint venture. The requirements of *Miranda* are totally inapplicable here.

The fact that it was the United States that initiated Molina-Chacon's arrest by re-

questing the assistance of Bermuda in apprehending him is irrelevant. The United States should not be deterred from requesting the assistance of other nations in catching wanted criminals because of possible misconduct in foreign interrogations. *See United States v. Lira,* 515 F.2d 68, 71 (2d Cir.), *cert. denied,* 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975); *Di Lorenzo v. United States,* 496 F.Supp. 79, 81 (S.D.N.Y.1980). The role of the United States in helping to plan the arrest of Molina-Chacon does not impose the requirements of *Miranda* on the "interrogation" by Bermudian officials. *See United States v. Mundt,* 508 F.2d 904, 906–07 (10th Cir.1974), *cert. denied,* 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975).

Having held that *Miranda* does not apply to the situation in question is not necessarily the end of our inquiry. It could conceivably be argued that the prohibition against self-incrimination may still apply to a foreign interrogation even if the requirements of *Miranda* do not. *See Brulay v. United States,* 383 F.2d 345, 349 n. 5 (9th Cir.), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967). If such is the case, it would appear that the following test would apply:

> Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, the primary criterion of admissibility [remains] the 'old' due process voluntariness test.

*Oregon v. Elstad,* —— U.S. ——, ——, 105 S.Ct. 1285, 1292–93, 84 L.Ed.2d 222 (1985).

The facts of this case indicate no overreaching on the part of Inspector Williams or Perez-Vivas. Molina-Chacon's statements were clearly voluntary and satisfied the relevant due process standards (if they do in fact apply to a foreign interrogation).

Having said all of the above, it is also clear to this Court that the requirements of *Miranda* do not apply to this situation because no custodial interrogation occurred. The Supreme Court has defined custodial interrogation as:

> questioning *initiated by law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) (emphasis added).

■ This Court finds that Perez-Vivas was *not* acting on behalf of the Bermuda Police but rather as a private individual performing a public service for the benefit of the Spanish Consul. The requirements of *Miranda* do not apply to questioning by private individuals even if they turn over information to law enforcement authorities. *United States v. Bowers,* 739 F.2d 1050, 1056 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 195, 83 L.Ed.2d 128 (1984); *United States v. Rose,* 731 F.2d 1337, 1345 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984); *United States v. Pullen,* 721 F.2d 788, 790 (11th Cir.1983); *United States v. Solomon,* 509 F.2d 863, 867 (2d Cir.1975); *United States v. Antonelli,* 434 F.2d 335, 337 (2d Cir.1970).

It is true that Inspector Williams asked Molina-Chacon some questions in addition to those posed by Perez-Vivas. However, as we just described in detail, *Miranda* is inapplicable to questioning by foreign police under circumstances like those of this case. There is no indication of any due process violation here and thus there are no grounds on which to suppress any of the statements in question.

### D. *Motion for Dismissal*

Molina-Chacon urges the dismissal of the latest superseding indictment on the grounds that it contains counts which allege additional charges and a broader conspiracy than that for which he consented to be returned to the United States. He cites *United States v. Rauscher,* 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), for the proposition that one may not be tried for a crime other than the offense for which one was extradicted. Accordingly, Molina-Chacon seeks to limit his prosecution to the offense of conspiring to import 80 kilo-

grams of heroin into the United States, on or about January 22, 1983, which was referred to in the waiver of extradition that he signed. These arguments are totally without merit.

The holding in *Rauscher* is actually an interpretation of a principle of international law known as the "doctrine of speciality." *Rauscher* is a narrow exception to the more general rule that the means by which the presence of a defendant is obtained does not affect the jurisdiction of a federal court. *See Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Later decisions have strictly limited *Rauscher* (and the doctrine of speciality) to its facts, which involved a formal extradition pursuant to treaty. *See, e.g., United States v. Valot*, 625 F.2d 308, 310 (9th Cir.1980).

In the present case the doctrine of speciality simply does not apply. Molina-Chacon was *not* extradited, rather he waived extradition and was deported. It is not appropriate for a federal court to determine whether a waiver of extradition in a foreign country was knowing or voluntary. *See United States v. Vreeken*, 603 F.Supp. 715, 722–23 (D.Utah 1984). We will note, nevertheless, that from the evidence in the record it is clear that Molina-Chacon's waiver was knowledgeable and voluntary. Faced with a valid waiver of extradition this Court will not apply the doctrine of speciality.

The defendant's argument is also flawed in that he misconstrues the purpose of the doctrine of speciality. Courts have recognized that the doctrine is a privilege of the asylum state, not the individual right of one accused of a crime. *Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir.), *cert. dismissed*, 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Berenguer v. Vance*, 473 F.Supp. 1195, 1197 (D.D.C.1979).

The proper inquiry, therefore, is whether the country surrendering the accused would object to the prosecution in question. *United States v. Jetter*, 722 F.2d 371, 373 (8th Cir.1983); *Fiocconi v. Attorney General of United States*, 462 F.2d 475, 480 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972). Nothing in the record leads this Court to believe that the Bermudian authorities would have any objection to the present indictment against Molina-Chacon. If there has been any violation of international law in this case it is incumbent upon the offended country to raise it, not the defendant herein. *United States v. Reed*, 639 F.2d 896, 902 (2d Cir. 1981). *See generally* Privitera, *Toward a Remedy for International Extradition by Fraud: The Case of Leonard Peltier*, 2 Yale Law & Pol'y Rev. 49, 56–57 (1983).

Finally, it is clear that the superseding indictment does not violate the doctrine of speciality. The offenses charged in the indictment, although perhaps enlarged in time, are all part of the same heroin conspiracy of which Molina-Chacon was originally appraised and are not so separate as to offend the doctrine. Under circumstances such as these the defendant's argument must fail. *See United States v. Rossi*, 545 F.2d 814, 815 (2d Cir.1976), *cert. denied*, 480 U.S. 907, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir.1962).

III. *Conclusion*

For all of the foregoing reasons defendant Molina-Chacon's motions are all denied.

SO ORDERED.