OPINION OF THE COURT
JoAnn Ferdinand, J.
Defendant was indicted for murder in the second degree, robbery in the first degree and other related charges, after he was identified by a witness in Jamaica, West Indies, as the perpetrator of the alleged crimes. Defendant moves for suppression of statements made by him to the police in Jamaica, on the grounds that such evidence was obtained in violation of his constitutional rights.
The court held a Huntley hearing[1] on July 21, 1994. Sergeant Detective Burnett Whyte and Detective Deputy Superintendent Lester Howell of the Jamaican Police Department were the only witnesses to testify at the hearing and I credit their testimony. Based upon the credible evidence, I make the following findings of fact and conclusions of law.
FINDINGS OF FACT
Detective Howell has been a Jamaican police officer for approximately 35 years and in November of 1991 was in charge of the homicide division. Detective Howell was in New *871 York on September 29, 1991, when he heard over the radio of the death of Sean Elliot, the victim of the alleged murder herein. Interested in the case, he contacted the Brooklyn Homicide Squad but was unable to obtain any information at that time.
After Detective Howell returned to Jamaica, Ms. Elliot, a Jamaican national and the mother of the deceased, came to his office, and informed him that the person who killed her son was in Jamaica. She provided Howell with the name of a witness to the crime. At Detective Howell’s request, she later returned with a photograph of the alleged perpetrator and said his name was Michael Forbes.
On November 19, 1991, Detective Howell, accompanied by Sergeant Whyte, met with the witness named by Ms. Elliot. The witness told Howell that when she was in America, a man known to her as "Mikey” robbed her and shot at her and killed Sean Elliot. She stated that she knew Mikey for over a year and described him as a short, dark and stocky man with a patch of gray hair in the front of his head. Howell then took out the photograph provided by Ms. Elliot and the witness identified the man as Mikey, the person who robbed her and killed Sean Elliot. She took the officers to 75 Hillview Terrace and told them that Mikey was living there. A few days later, Sergeant Whyte conducted a raid of 75 Hillview Terrace but the defendant was not found there. Detective Howell then asked the witness to try and obtain another address for Mikey.
On November 28, 1991, based on new information from the witness, Sergeant Whyte, with other policemen, conducted a raid of 59 Hillview Terrace between 5:30 and 6:00 in the morning. Whyte knocked on the gate and shouted police. Someone came out and opened the gate and the police entered the house. They conducted a search and found two men and a woman. Whyte asked for Michael Forbes and the defendant acknowledged himself. Sergeant Whyte identified himself and cautioned the defendant in the following manner, "You’re not obliged to say anything unless you wish to do so, but whatever you say may be taken down in writing and given as evidence.” Whyte informed defendant that he was wanted in New York for the murder of Sean Elliot. Defendant denied being in New York at the time the murder was committed. Whyte then asked him for his passport but the defendant said it was in the District Epsome, Parish of St. Mary. Whyte conducted a search for the defendant’s passport but found no travel docu *872 ments. Whyte asked the defendant to accompany him to police headquarters and the defendant agreed. There the defendant was placed in an office. Although not free to leave the police station, the defendant was not handcuffed and was free to walk around.
Sometime after 7:30 a.m., Whyte brought the identifying witness to the headquarters. The witness identified the defendant as Mikey, the man who shot Sean Elliot.
At approximately 9:00 a.m., the defendant was brought into Howell’s office. Detective Howell introduced himself and cautioned the defendant in the following manner, "You’re not obligated to say anything unless you wish to do so, but whatever you say may be taken down in writing and given in evidence.” While Sergeant Whyte testified that Detective Howell advised the defendant of his right to counsel, the court discounts such testimony and credits Howell’s own testimony as to what rights were explained to defendant. The defendant was advised that the police had information that he was the person who shot and killed Sean Elliot in New York City on September 29, 1991. Defendant said he knew nothing of the murder and was not in America at that time. Howell asked the defendant if he had a passport and where it was. Defendant said that his passport was in the Parish of St. Mary and he agreed to go with the police to get it. Sergeant Whyte made the trip to St. Mary with the defendant, a two-hour drive, but did not find the passport. When they returned, Detective Howell cautioned defendant again and questioned him further. At this point, defendant admitted that he was in America at the time of the murder and said that his passport was at his brother’s home in the Bronx. He also stated that he knew Ms. Elliot; that he had visited her home once; that he spoke with her on the phone; that he heard of the death of Sean Elliot but had not called Ms. Elliot to express his sympathies for fear of being implicated. He denied shooting at a woman and killing Sean Elliot.
Detective Howell had telephone conversations with the New York City Police sometime after meeting with Ms. Elliot and the witness but did not receive a warrant for the defendant’s arrest until after he was placed in custody in Jamaica.
CONCLUSIONS OF LAW
It is uncontroverted that at the time of the statements sought to be suppressed herein, defendant was in the custody of *873 the police of a foreign jurisdiction and had not been given formal Miranda warnings. Defendant seeks suppression of statements made by him in Jamaica, West Indies, during an interrogation by Jamaican Police on grounds that such statements were involuntarily made. Defendant asserts that not only were these statements made without Miranda warnings but under circumstances that shock the conscience. The People contend that the statements were voluntarily made to foreign officials who are not bound by the requirements of Miranda and under circumstances which do not shock the conscience.
The burden of proof at a hearing on a motion to suppress statements is on the People to prove the voluntariness of the defendant’s statement beyond a reasonable doubt. (People v Huntley, 15 NY2d 72, 78 [1965].)
"It is well established that the Fourth Amendment and its remedial corollary, the exclusionary rule, have no application to the extraterritorial actions of foreign authorities.” (People v Capolongo, 197 AD2d 3, 7 [2d Dept 1994]; United States v Molina-Chacon, 627 F Supp 1253 [ED NY 1986]; United States v Cotroni, 527 F2d 708 [2d Cir 1975].) This is because “[t]he underlying policy of the exclusionary rule is to deter overreaching and illegal police conduct, and the exclusionary rule is considered incapable of influencing the conduct of foreign authorities.” (People v Capolongo, supra, at 8.)
As the Fourth Amendment with its exclusionary rule does not generally apply to searches conducted by foreign officials, similarly, the Miranda warnings attendant to the Fifth Amendment do not generally apply to interrogations conducted by foreign officials. (See, United States v Molina-Chacon, supra, at 1262, and cases cited therein.)[2] "[S]ince the Miranda requirements were primarily designed to prevent United States police officers from relying upon improper interrogation techniques and as the requirements have little, if any, deterrent effect upon foreign police officers, the Miranda warnings should not serve as the sine qua non of admissibility.” (United States v Welch, 455 F2d 211, 213 [2d Cir 1972]; United States v Leon, 468 US 897 [1984]; United States v Mount, 757 F2d 1315 [DC Cir 1985].)
However, evidence obtained in a foreign jurisdiction may be *874 excluded where the conduct of the foreign officials in acquiring the evidence is so extreme as to shock the judicial conscience. (United States v Maturo, 982 F2d 57, 60-61 [2d Cir 1992]; United States v Nagelberg, 434 F2d 585, 587, n 1 [2d Cir 1970].) The circumstances of this case do not warrant such a finding.
While the rights of an accused in Jamaica may vary from those of our own, the court does not find that the conduct of the Jamaican Police shocked the conscience. The police had a known witness who was the victim of a robbery and an eyewitness to a murder who named the defendant as the perpetrator. Thus the police had reasonable cause to detain the defendant for questioning. Sergeant Whyte did not forcefully enter the residence where the defendant was staying but rather the gate was opened by one of the residents. The defendant was immediately cautioned that he could remain silent and that any statements by him could be used against him in court; and defendant was made aware of the accusations against him. The defendant voluntarily accompanied the police to their headquarters. Prior to any questioning, the defendant was not handcuffed and was free to walk around the office. The defendant was not threatened, coerced, or beaten, nor was he subjected to lengthy interrogations. There were no promises made to him nor trickery used to induce a confession. Each time Detective Howell questioned defendant he was cautioned of his right to remain silent and that any statement he made could be used against him. Accordingly, the court does not find that the conduct of the Jamaican Police was inappropriate nor of such character as to "shock the judicial conscience”.
There is no claim by defendant nor does the court find any evidence that the New York Police used foreign police officials as instruments or agents or that cooperation between the two police agencies was designed to evade constitutional requirements applicable to American officials. (See, United States v Maturo, supra.)
The prohibition against self-incrimination may still apply to foreign interrogations, even though the application of Miranda does not, where the statement is shown to be involuntary and thereby unreliable. Accordingly, the test for admissibility is whether under the totality of the circumstances the statement was voluntary. (See, United States v MolinaChacon, supra, at 1263; United States v Welch, supra.) If the court finds that the statement was involuntary, it must be *875 excluded because of its inherent unreliability. The circumstances of this case do not support such a conclusion. As discussed above, the court does not find that the conduct of the Jamaican Police was either coercive, threatening or inappropriate in light of the information known to them and the seriousness of the accusations. Defendant was repeatedly advised of his right to remain silent. There is no evidence that the defendant was treated, detained, or interrogated in such a manner as to coerce statements which were involuntary. Under the totality of the circumstances the court finds defendant’s statements were voluntary.
Therefore, the court finding that Miranda warnings were not required and that there was no violation of defendant’s right against self-incrimination, the motion for suppression of the statements made to the Jamaican Police is denied.

. The hearing originally encompassed both the admissibility of defendant’s statements as well as identification testimony by a witness. The People, however, were unable to secure the attendance of the witness who identified the defendant at the police headquarters and agreed that if such evidence were to be offered at trial the Wade hearing would be reopened.

. While the court found no New York State cases which address the applicability of the Miranda warnings to statements obtained in a foreign jurisdiction, decisions of the Federal courts are unified in their adherence to the general rule of inapplicability.