OPINION OF THE COURT
Carol Berkman, J.
Defendant, indicted for two counts of murder in the second degree and related charges, has moved to suppress statements. A hearing on the motion was held before this court starting on August 11, 2005. Detective Joseph Hadley of the Newark Police Department and Detectives Elpedio DeLeon and James McDarby of the New York City Police Department testified for the People. Their testimony was credible. There were no other witnesses.[1]
*498 The People initially noticed three statements of defendant. The first was to Detective Hadley in New Jersey in June 2001. The People have now declared that this statement will not be used on their direct case. The second statement, also made in New Jersey, was to DeLeon and McDarby on February 20, 2002. Thereafter, on the,same date, the defendant made a third, videotaped, statement to New York County Assistant District Attorney William Greenbaum. The motion to suppress the February 20, 2002 statement to DeLeon and Greenbaum is denied based on the following findings of fact and conclusions of law.
Findings of Fact
On May 16, 2001, New York police found the bodies of Juan Campos and Gabriel Ciantes in Riverside Park. They had been killed by gunshots to the head. Investigation revealed that the men worked in Little Falls, New Jersey, and that Campos had been driving a Jeep Cherokee. When the vehicle was found in New Jersey, the New Jersey authorities handed it over to New York. A fingerprint on the vehicle led to Antoine Hutchinson, who implicated defendant Polk and Lamar Lee in the homicides. A further interview with Hutchinson’s wife yielded information connecting Polk and Lee with a May 17, 2001 armed robbery of six or seven people in a bar in downtown Newark. A witness to the bar robbery described the getaway vehicle and gave a partial plate substantially, although not perfectly, matching that of Campos’ Jeep Cherokee.
Detective Hadley was then assigned to the previously stalled investigation of the Newark robbery. Hadley talked to DeLeon, who told him of the possible link between the Campos vehicle and the Newark robbery and supplied the names of Polk and Lee as suspects for both crimes. Hadley discovered that Polk and Lee were in jail in New Jersey on totally unrelated charges.[2] Although each had a lawyer for these unrelated charges, New Jersey law gives no derivative right to counsel for unrelated matters. Hadley first questioned Lee, who admitted his participation in the robbery and implicated Polk. DeLeon had asked Hadley to make inquiry about the getaway vehicle, which *499 Hadley would have done in any event.[3] Lee said they stole the car, kidnapped two men and Polk shot them. Defendant Polk was interviewed shortly thereafter. After waiving his Miranda rights, Polk voluntarily admitted committing the bar robbery and described his participation in the carjacking, kidnapping and homicides which are the subject of the instant indictment. Polk said that Lee was the shooter. DeLeon waited outside the interview room, but upon the advice of the New York County prosecutor, did not personally participate in the questioning. Hadley gave DeLeon a copy of the statements immediately upon completion. Hadley had checked with DeLeon to see if the date of the interviews was convenient for him (transcript at 127), but there is no evidence that DeLeon was otherwise actively involved in the arrangements (see contention to contrary, defendant’s mem at 4). Lee’s written statement is eight pages long. In response to the question “[d]id you steal the car from the parking lot?” Lee gave a narrative response describing the carjacking and homicides. This takes less than one page. Defendant’s written statement is nine pages long. The writing shows one question by Hadley about the getaway vehicle used for the Newark robbery, “Can you tell me how you came to have this Jeep,” and Polk’s answer as written out, including a description of what he and Lee did with the Jeep after the robbery, consumes a page and one half of this statement. While the defense argues that defendant simply repeated this statement when questioned many months later by DeLeon and Assistant *500 District Attorney Greenbaum, those later statements are far more detailed with respect to the crimes charged in this indictment.
After Hadley finished interviewing Lee and Polk, he referred the Newark robbery matter to the New Jersey prosecutor, who secured an indictment for that crime. On December 17, 2001, defendant pleaded guilty in the Superior Court of New Jersey to various charges, including the Newark bar robbery. He was sentenced pursuant to this plea on January 25, 2002. According to the plea minutes, these pleas (and a previous plea to contempt in Family Court) fully disposed of all of defendant’s then pending cases.
On February 20, 2002, DeLeon and Assistant District Attorney Greenbaum interviewed defendant in New Jersey. The credible evidence demonstrates beyond a reasonable doubt that each of them again advised defendant of his Miranda rights. He waived them and made voluntary statements to them without coercion of any kind.
Conclusions of Law
The defense contends that the statement to Hadley was taken in violation of defendant’s right to counsel under the New York State Constitution, and that the subsequent statements to DeLeon and Greenbaum were tainted by this constitutional error. Accordingly, although the People will not use the statement to Hadley in their direct case, this court has examined the admissibility of the statement to Hadley and, assuming that it is inadmissible, whether the February 20, 2002 statements to DeLeon and Greenbaum were tainted by the illegality. The latter question is clear, both factually and legally. There is no taint. The former question presents more legal complexity. This court concludes that New York’s constitutional right to counsel did not cross its borders, at least under the circumstances presented here, and that the statement to Hadley is also admissible.
Addressing the taint issue first, after defendant’s statement to Hadley, defendant had many months to confer with his New Jersey attorney. Under New York law, defendant’s New Jersey sentence in January 2002 terminated his right to counsel for those cases, and any derivative right for unrelated cases. (People v Robles, 72 NY2d 689, 698 [1988]; People v Colwell, 65 NY2d 883, 885 [1985].) Thereafter, a detective and an assistant district attorney, neither of whom had ever questioned or even met defendant before, each correctly administered Miranda *501 warnings. Contrary to the defense argument (defendant’s mem at 13), their substantive questioning went far beyond Hadley’s on the issues of the carjacking and subsequent homicides. Neither mentioned defendant’s statement to Hadley. The evidence therefore establishes beyond a reasonable doubt that defendant’s statements to Detective DeLeon and Assistant District Attorney Greenbaum were not tainted by any illegality in the statement to Hadley. (See, e.g., People v Thompson, 256 AD2d 88 [1st Dept 1998]; People v Rodriguez, 231 AD2d 477 [1st Dept 1996]; see also, People v Paulman, 5 NY3d 122, 131 n 4 [2005].)
The credible evidence establishes beyond a reasonable doubt that aside from the New York State right to counsel issue raised by the decisions in People v Burdo (91 NY2d 146, 150-151 [1997]) and People v Rogers (48 NY2d 167 [1979]), defendant’s statement to Hadley was entirely voluntary, as were his statements to DeLeon and Greenbaum, and the defense makes no argument to the contrary. Additionally, the credible evidence establishes beyond a reasonable doubt that, in questioning defendant, Hadley complied with the requirements of the United States Constitution and New Jersey law. (State v Tucker, 137 NJ 259, 274-278, 645 A2d 111, 119-121 [1994] [even after counsel has entered a case for which defendant is incarcerated, defendant may, without the presence of counsel, waive counsel for an unrelated interrogation].)
Bing, Burdo and Rogers
The defense argues that admitting defendant’s statement to Hadley in evidence would offend this State’s public policy of protecting the right to counsel. The People argue that this defense contention is defeated by the reasoning of People v Bing (76 NY2d 331 [1990]). Bing supports the People’s argument that defendant had no derivative right to counsel in New Jersey under the New York Constitution and that accordingly defendant’s New York State constitutional right to counsel was not violated by Hadley’s questioning.
In Bing, a defendant suspected of a New York burglary was arrested in New York State on an Ohio warrant. Bing actually had Ohio counsel in his Ohio case, and did not merely have the right to counsel in that case because of the commencement of the prosecution. The latter theory (commencement of proceedings) of a derivative right to counsel had previously been rejected by the New York Court of Appeals. (People v Ridgeway, 64 NY2d 952, 954 [1985] [defendant arrested by FBI for bank robbery and complaint filed in and warrant issued by federal *502 court; New York’s indelible right to counsel not triggered].) In Bing, the Court of Appeals unanimously agreed that there was no derivative right to counsel stemming from the pendency of an unrelated Ohio case in which Bing had counsel, the majority because it overruled People v Bartolomeo (53 NY2d 225 [1981]), and the concurrence because the pending case was outside of this state. The majority stated (76 NY2d at 347): “[I]f an Ohio charge may serve as a predicate for a derivative right to counsel, so may a pending charge in Timbuktu.”
The concurrence took the view that an out-of-state charge (much less a Timbuktu charge) should not serve as a predicate for a derivative right to counsel. (76 NY2d at 356.) As the concurrence states (at 357): “There is not the same benefit to be had in suppressing statements . . . in New York prosecutions in the interest of protecting attorney-client relationships in other States.” Additionally, the concurrence recognizes that where the unrelated charges are in another state, New York authorities are highly unlikely to be interested in questioning the defendant about them.
Accordingly, had this defendant been in custody in this state on a warrant for his unrelated New Jersey matters, and questioned in this state about the homicides and the Newark bar robbery, the entry of counsel into the unrelated New Jersey cases would not have given defendant a derivative right to counsel in New York. Bing and Ridgeway both reject importing a derivative right to counsel from a pending case in another jurisdiction even where the defendant is incarcerated pursuant to that case. Factually this case is different, since defendant was incarcerated, represented and questioned in the same sister state. This exact factual scenario has not been considered by the appellate courts, although in People v Fiber (261 AD2d 484 [2d Dept 1999]), the Second Department permitted in evidence a statement made to a New York police officer in New Jersey where the defendant was in custody for unrelated charges. The Court noted that Fiber was not actually represented by counsel, nor had he" requested counsel. (See also People v Miller, 9 Misc 3d 532 [Sup Ct, Kings County 2005] [issuance of federal warrant did not bar interrogation as defendant was without counsel in the federal matter].) Notwithstanding the dictum in Fiber, however, the logic of Bing compels the conclusion that Rogers-Burdo derivative-counsel rights also do not cross our state’s borders and did not attach to defendant in this case.
*503 Extraterritorial Application of New York Rules
The defendant argues, however, that there was an agency relationship between Hadley and DeLeon and that therefore New York rules should prevail. Where a person’s rights under the New York State Constitution are violated, even evidence seized by non-New York State actors will be excluded. Thus, People v Griminger (71 NY2d 635 [1988]) applied New York State constitutional standards to suppress evidence seized pursuant to a federal warrant by federal authorities in Nassau County. But Griminger does not mandate that New York exclusionary rules be applied blindly to all evidence offered in New York courts. Rather, the inquiry is whether any New York State constitutional right has been violated, and Bing demonstrates that no such violation occurred here. Indeed, Griminger was referenced in the majority decision in Bing (76 NY2d at 344-345):
“It is the New York enforcement agencies that violate the suspect’s rights and thereby discover evidence that they will, almost certainly, deliver to Ohio authorities and ignoring their conduct frustrates this State’s recognized interest in protecting the attorney-client relationship (cf., People v Griminger, 71 NY2d 635, 641 [evidence legally seized pursuant to a warrant valid under Federal law suppressed in a state prosecution because it did not satisfy New York standards]).”
Nonetheless, Bing declined to find a derivative right to counsel based on the entry of counsel in an out-of-state matter. Under this analysis, Hadley did nothing DeLeon could not have done.
Assuming, notwithstanding Bing, that DeLeon was bound by some additional New York State strictures, a close analysis of Griminger demonstrates that those strictures were not violated in this case. In Griminger, there was no participation by New York authorities until after the contraband was recovered pursuant to a warrant issued by a federal judge and the matter was handed over to state authorities for prosecution. The basis for issuing the warrant did not meet state standards, but it was sufficient under federal law. In suppressing, the Court of Appeals concluded that it could “discern no reason why [a defendant tried in New York courts] should not also be afforded the benefit of our State’s search and seizure protection.” (71 NY2d at 641.) Griminger cites Elkins v United States (364 US 206 [I960]), Lustig v United States (338 US 74 [1949]) and People v Ridgeway (64 NY2d 952 [1985], supra) for this proposition.
*504 Lustig was decided, under the “silver platter” doctrine, which at the time of that decision permitted federal courts to use evidence that had been illegally seized by state authorities. Since the Lustig search was illegal by federal standards, the evidence was suppressed because of participation by a federal agent. Elkins comprehensively rejected the “silver platter” doctrine, reasoning that, exclusionary rule or not, state officers were prohibited from unreasonable searches and seizures (364 US at 212). Thus, pursuant to the Supreme Court’s supervisory power, it chose “to compel respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it” (364 US at 217). Moreover, the Supreme Court emphasized that “the imperative of judicial integrity” (364 US at 222) demands that courts not admit illegally seized evidence lest the courts too become lawbreakers. Ridgeway, as previously noted, involved a federal arrest, complaint and warrant with subsequent questioning by state authorities. As relevant to Griminger, Ridgeway cites the lack of any indication that the federal arrest was intended or employed to circumvent defendant’s state right to counsel. (64 NY2d at 954.)
If Rogers and Burdo cross this state’s borders under certain circumstances, the reference to Timbuktu in the majority and concurring opinions of Bing, together with the citation to Griminger, suggest a method for determining when actions outside of this jurisdiction offend against this State’s Constitution. There are many decisions, primarily federal, dealing with the analogous issues that arise when foreign authorities are involved in the seizure of evidence.[4] While the New York Court of Appeals has not conclusively addressed the American-foreign issue (see, e.g., People v Capolongo, 85 NY2d 151, 163-164 [1995] [wiretap evidence]), the First Department has, in People v Smith (283 AD2d 189, 190 [1st Dept 2001]), which relies on the Second Circuit federal rule, citing United States v Maturo (982 F2d 57, 61 [2d Cir 1992], cert denied sub nom. Pontillo v United States, 508 US 980 [1993];[5] see also, People v Mejia, 162 Misc 2d 679, 680 [Sup Ct, NY County 1994]). The federal rule where foreign *505 authorities are involved, at least where their involvement is not a ruse to evade local laws and their conduct does not shock the conscience, requires an examination of the degree of involvement of American officials.
In Smith, the trial court admitted Smith’s statement to Jamaican authorities despite their failure to comply with the strict requirements of Miranda. As explained in Smith v Artus (2005 WL 1661104, 2005 US Dist LEXIS 14406 [SD NY, July 14, 2005]), which denied Smith’s petition for a writ of habeas corpus, the trial court had found that Miranda did not apply because the Jamaican authorities were not acting as agents of American authorities. The District Court also found that there was no joint venture, as American authorities did not actively participate in the questioning. Even if they supplied the information leading to Smith’s arrest, New York police officers were not present at the scene of the interrogation and did not instruct Jamaican authorities to interrogate Smith, or authorize or direct the interrogation.
The defense argues that Hadley was “clearly acting as an agent of the New York City Detectives, who had been told by the District Attorney’s Office they could not question Mr. Polk” (defendant’s mem at 2). Surely this advice was prudent, even if not mandated by the case law, and DeLeon’s following that advice does not deserve the cynical interpretation that his conduct was a ruse to evade rather than scrupulously follow New York’s constitutional rules. Moreover, the defense cites no authority for the proposition that mere interstate cooperation between law enforcement officers, which is surely desirable, creates an agency relationship between them. The defense in effect argues that Hadley was simply acting on DeLeon’s directions. But Hadley had an important investigation of his own, and the court credits his testimony that he asked no questions because of DeLeon’s interest that he would not have asked to complete his investigation of the New Jersey case.
An examination of the case law with respect to the American-foreign issue demonstrates that Hadley’s investigation was so independent as to preclude a finding of agency or joint venture between New Jersey and New York in this case. While the difference between the agency rule and the joint-venture rule (or the other formulations in various circuit courts) is certainly not as clear as night to day (see United States v Molina-Chacon, 627 F Supp 1253, 1259 [ED NY 1986], affd sub nom. United States v DiTommaso, 817 F2d 201 [2d Cir 1987]), *506 by any of these formulations, New York authorities were not so involved in Hadley’s interrogation of defendant so as to preclude admissibility under the American-foreign rules. Hadley was happy to get a lead from the New York police, and promptly acted on that lead to investigate a serious crime in his own jurisdiction. According to his credible testimony, he asked the questions he needed to ask, including the question about the getaway vehicle. An agency or joint venture was not created simply because his goals and the stated interest of the New York detectives happened to coincide. Nor was an agency created simply because Hadley was willing to share the fruits of his interrogations, and New York detectives were eager to receive them. (See United States v Bagaric, 706 F2d 42, 69 [2d Cir 1983], cert denied 464 US 840 [1983] [evidence obtained by a Canadian official during lawful pursuit of separate and valid Canadian investigation; close cooperation with Americans does not mandate suppression in American courts].)
DeLeon’s presence in the other room when Hadley interviewed defendant does not transform this interrogation into a joint venture. (Pfeifer v United States Bur. of Prisons, 615 F2d 873, 877 [9th Cir 1980] [United States agent present and armed, but silent during the interrogation]; United States v Trenary, 473 F2d 680, 681-682 [9th Cir 1973] [American agent present but acted only as an interpreter].) Nor did the investigation become a joint venture simply because the information from New York law enforcement was instrumental in the New Jersey robbery investigation. (Compare United States v Verdugo-Urquidez, 856 F2d 1214, 1224-1228 [9th Cir 1988] [Mexico had no real interest in investigation undertaken at United States’ request], with United States v Welch, 455 F2d 211, 213 [2d Cir 1972] [fact that local police had an interest in the investigation demonstrates that their involvement was not a ruse to evade local rules], and United States v Heller, 625 F2d 594, 599 [5th Cir 1980] [arrest was made by British authorities on tip from United States that defendant had counterfeit United States currency which he planned to distribute in England and Europe, but no exchange of information]; see also United States v Molina-Chacon, 627 F Supp 1253 [1986], supra [Bermuda acted on request for assistance by United States, allowed United States to be present during seizure and to photocopy documents seized, but no joint venture found; with respect to confession, admissible although United States agent acted as interpreter, where questioning for purpose of prisoner’s welfare and no request by United States *507 that Bermudan authorities interview prisoner for the purpose of developing further information].)
Hadley was conducting an important New Jersey investigation and did not disobey the Constitution he was sworn to uphold. In admitting the statement made to him, this court would not be an accomplice to any “willful disobedience” of Hadley’s constitutional mandates. (Elkins v United States, supra, 364 US at 223.) Nor did DeLeon, by standing by ready to receive any new leads or evidence pertinent to the New York prosecution, “encourage [Hadley] in the disregard of constitutionally protected freedom.” (Id. at 221-222.) Hadley conformed to the United States Constitution and the New Jersey rules and questioned defendant just as he would have had DeLeon not been waiting in the wings, and suppression of the statement by the New York courts would and should not deter Hadley from acting as he did. It is similarly difficult to imagine how DeLeon could or should have continued his homicide investigation differently so as to respect his own constitutional imperatives.
DeLeon did his best to comply with New York rules. He sought legal advice from the prosecutor and followed it. He turned over his information to a very interested sister state detective and made New York’s interests clear, but those interests simply overlapped with Hadley’s interest in resolving the Newark robbery. As discussed in Bing, there was little else DeLeon could have done in navigating the New Jersey system. As New Jersey does not recognize a derivative right to counsel, defendant’s New Jersey lawyer on the unrelated case(s) could well have seen this new matter as beyond the scope of his representation. The New Jersey courts would have seen no reason to assign counsel for this purpose. Assuming arguendo that the New York rules followed DeLeon when he left the state, he did his best to follow them while still hoping to get more leads to solve a serious New York crime. Moreover, DeLeon did not choose New Jersey as the situs for the continued investigation; in a very real sense, the defendant did. Under all of these circumstances, Hadley was not acting as DeLeon’s agent, and no purpose of the exclusionary rule or public policy would mandate suppressing defendant’s statement to Hadley. In any event, as previously discussed, the subsequent statements to DeLeon and Greenbaum were untainted by the Hadley statement and otherwise entirely voluntary and admissible.

. Since the hearing, the defendant has made untimely pro se motions seeking discovery, arguing that the evidence before the grand jury was insufficient, and challenging this County’s geographical jurisdiction over the charges. These issues have previously been considered and denied pursuant to motions of counsel.

. People’s exhibit 9 reveals that defendant was taken into custody on May 29, 2001 on charges of contempt and domestic violence. The minutes of his guilty plea in New Jersey also refer to an April 29, 2000 drug possession charge and a May 4, 2001 robbery of one Donnell Shields. There is no claim of any relationship between these charges and the May 17, 2001 Newark bar robbery or this indictment’s May 15, 2001 carjacking-kidnapping-homicide charges.

. Hadley testified that he had spoken with the New York detectives about the case to the extent that he knew there was a vehicle possibly in common between the Newark bar robbery and the New York homicide. DeLeon candidly admitted that he told Hadley he wanted information concerning the homicides (transcript at 128). Little Falls, New Jersey, where the carjacking involved in this case began, was not in Hadley’s jurisdiction and Hadley was not investigating the carjacking per se. Rather, Hadley testified that while it was accurate to say that New York wanted him to make inquiry about the getaway car, “at the same time I had to because it’s part of my case” (transcript at 32; see also transcript at 57). Following up on this issue on cross-examination, Hadley then testified that while the New York detectives were “pretty sure it was the same car,” he had “to confirm, can’t just take it as information” (transcript at 54). On this issue, DeLeon testified on cross-examination as follows:
“Q: And you worked with them to assist them in solving the Newark robbery because in your view that was going to lead you to the perpetrators of the homicide, correct?
“A: I really didn’t get involved with their robbery at all . . .1 was actually monitoring it to see if there was anything that would surface involving the New York murder but not actually assisting them in their case” (transcript at 121-122).

. For convenience, this is referred to as the “American-foreign” issue.

. The test articulated in the Second Circuit excludes evidence seized by foreign authorities where (1) the methods “shock the judicial conscience” or (2) the foreign authorities were agents or “virtual agents” of the local authorities or (3) the cooperation was “designed to evade [local] constitutional requirements.” (982 F2d at 61.) While the Second Circuit has neither followed nor rejected the so-called “joint venture” theory, other circuits have. (982 F2d at 62-63.)